THE STATE OF KANSAS v. GEORGE W. PETTY.

1. RES GESTÆ; *In Case Stated, Declaration no part of.* On May 27th, 1866, C. was killed, while sitting in the door of his house, by a bullet from a pistol, alleged to have been discharged by one P.: *held*, that the declaration of the wife of the deceased, made to persons one hour after the death of her husband, that she recognized P. as the person who killed her husband, forms no part of the *res gestæ.*

2. WITNESS, *Narrating Facts Differently at Different Times; General Rule; Exception.* When a witness is assailed on the ground that he narrated

the facts differently on a former occasion, it is ordinarily incompetent to sustain him by proof that on other occasions his statements were in harmony with those on the trial. To this rule there are exceptions. Thus, where the impeachment goes to contradict the witness by prior inconsistent declarations, and charges him with a recent fabrication of his testimony, it is proper to show that the same account was given by him to other persons anterior to the date of the alleged fabrication. In order, however, that the confirmatory statements of the witness shall be admitted, it must clearly appear that they were made antecedently to the contradictory declarations given in evidence.

3. ——— The case of *Smith v. State*, 1 Kas. 365, cited, as to the sufficiency of the indictment in charging the crime of murder in the first degree.

## *Appeal from Greenwood District Court.*

INDICTMENT for murder, charging *George W. Petty* with the felonious killing of Robert Clark, at the county of Greenwood, in May, 1866. At the May Term, 1878, of the district court, *Petty* was found guilty of murder in the first degree, and sentenced accordingly. He now appeals to this court.

*T. L. Davis*, for appellant, maintained that the court erred in admitting the testimony of the witnesses Kellogg, Guffey and the two Hoovers in regard to what Mrs. Clark had told them concerning the murder of her husband; that their testimony was simply hearsay testimony, and not competent for any purpose, citing *State v. Montgomery*, 8 Kas. 360; that the statements of Mrs. Clark could not be admissible upon the theory that they were a part of the *res gestæ*, citing 3 Conn. 250; that the trial of Lord George Gordon for treason, (21 State Trials, 485,) wherein the cry of the mob was received in evidence as forming a part of the *res gestæ*, to which trial counsel for the state had called the attention of the court below, is not an authority in favor of admitting the statements of Mrs. Clark, citing 9 Cush. 36.

The most the state could do in the way of supporting the testimony of Mrs. Clark would be to show that she did not make the statements to Tatman, sworn to by him. The testimony of Kellogg, Guffey and the Hoovers with reference

to the declarations made by Mrs. Clark in their hearing, does not even impliedly contradict the testimony of Tatman as to what she told him. Of course, it would have been competent and proper for the state to support the testimony of Mrs. Clark by contradicting that of Tatman, but the proposition that her testimony can be supported by evidence of declarations made by her to others different from those made by her to Tatman, seems absurd.

*H. C. Rizer*, county attorney, and *W. A. Johnson*, for The State:

The court did not err in admitting the testimony of Kellogg, Guffey, Chris. Hoover and William Hoover, as to what statements Mrs. Clark made at her house the afternoon after her husband was shot, as to who it was that shot Clark, as to whether she recognized the defendant Petty as one of the three men that were at her house when her husband was killed. The defendant had laid a foundation for the impeachment of Mrs. Clark, by trying to prove that she had stated at her house on the afternoon after her husband was shot, that he was shot and killed by three strange men; that she had said she did not know either of the three men; that she did not know who shot Clark. Joe Tatman testified that Mrs. Clark said to him she did not know who shot him — that they were three strange men, and that she did not know any of them; and that he (Tatman) said to her that he believed it was Wash. Petty, and that he had not heard Petty's name mentioned in connection with the murder until he suggested his name to Mrs. Clark; that there was quite a number of persons at Clark's when he got there. The statements of Mrs. Clark were not called out as evidence against defendant, but in support of the evidence already given by her. It was competent for the state, where an attack had been made upon one of its witnesses, to support the witness by proving by other witnesses who were present at the time referred to by defendant's witnesses, that the witness attacked had at the time and place mentioned made the same state-

ments that she had testified to in court. Where a witness is called to contradict another, who had stated such-and-such expressions were used, or the like, counsel are permitted to ask whether those particular expressions were used or those things said, instead of asking what the witness stated, or what was said.

The object on the part of counsel for defendant in introducing the witness Tatman was clearly to support the theory maintained by him throughout the trial, viz., that Mrs. Clark never thought of Petty being one of the murderers until after Tatman suggested it, two hours after the killing. The witnesses Kellogg, Guffey and the Hoovers, introduced by the state to support Mrs. Clark's testimony, were among the first to arrive at Clark's house after the killing, every one of them having reached the house within an hour after the killing. Their testimony was, that as soon as they arrived at Clark's house, Mrs. Clark told them Petty was one of the three men who had killed her husband. She said she recognized Petty, but did not know who fired the shot. The state thus proved by these witnesses that Mrs. Clark had said it was Petty before she had an opportunity to see Tatman after the murder. When she did see Tatman, she told him she did not know who fired the shot; and this is probably what caused him to think she said she did not know any of the men.

The opinion of the court was delivered by

HORTON, C. J.: The appellant was indicted in May, 1870, for the alleged murder of one Robert Clark, in May, 1866, and was convicted in the court below of murder in the first degree, at the May term, 1878.

On the trial, Mrs. Clark, the widow of the deceased, testified on the part of the state, that on Sunday, the 27th day of May, 1866, her husband and she were sitting in their cabin, when they noticed a stranger on horseback ride around the south end of the cabin and in front of the east door. He asked if Robert Clark lived there, and being answered in the affirmative, asked if he was at home. Clark said, Yes. The

stranger then inquired the direction to Brazil's. Clark, still sitting in his chair, leaned his body out of the door, and while in the act of giving the man the direction to Brazil's, was shot from the north end of the house; that she did not see or know who fired the pistol; that Clark jumped up and attempted to reach his gun, hanging on a rack, but fell to the floor. After he had fallen down, she looked at the door and recognized the appellant as he passed on horseback; that almost immediately after she saw the appellant pass the door, three men on horseback rode up to the window in the south side, or end of the cabin, with their revolvers drawn and pointed toward the house; that she recognized the appellant as one of them, and said to him: "For God's sake, Wash. Petty, don't kill me and my little children — you have already killed my husband;" that the three men stood at the window until her husband was dead, and then rode away.

The appellant, on his defense, introduced as a witness one Tatman, who testified that he arrived at Clark's house about two hours after Clark was killed; that when he reached there, the body had been dressed and laid out; that as soon as he got to the house, Mrs. Clark came up to him at the door, and said, "Oh, Joe! Robert has been murdered;" that he asked her, "Who did it?" and she replied, "She did not know who shot him; that there were three strange men, and she did not know any of them;" that he said to her, "He believed it was Wash. Petty;" she answered, "She did not know either of the three men;" that he had not heard Petty's name mentioned in connection with the murder until he suggested it to Mrs. Clark.

On rebuttal, the state produced as witnesses, Seth Kellogg, E. C. Guffey, Chris. Hoover and William Hoover. Kellogg was permitted to testify, against the objection of appellant, that Mrs. Clark told him the day her husband was killed, "That Wash. Petty was one of three men that killed her husband; that she saw and recognized him." The Hoovers, against like objections, testified that Mrs. Clark also told them, at her house, the evening her

*Res gestæ; declaration no part of.*

husband was killed, "That Wash. Petty was one of the three men that killed her husband." Guffey gave similar testimony, but fixed the time of the declarations of Mrs. Clark as having occurred about one hour after the killing of Clark, and before the body was laid out. None of these conversations of Mrs. Clark, related on the part of the witnesses for the state, were connected with the statements of Tatman with Mrs. C.; nor does it appear from the record that either of the witnesses on rebuttal was present at the time of the conversation between Tatman and Mrs. C.

The statements of Mrs. Clark to Kellogg and the Hoovers formed no part of the transaction, and were only hearsay; hence, they were not entitled to be received as a part of the *res gestæ.* This conclusion seems to be conceded; but it is insisted that this testimony was competent, not as evidence against the appellant, but in support of the evidence previously given by Mrs. C.; that, as the testimony of Tatman was introduced to contradict and destroy the evidence of Mrs. Clark, by showing that she never thought of Petty being one of the murderers until Tatman suggested it, two hours after the homicide, the testimony on rebuttal was competent to sustain Mrs. Clark. As to Guffey's evidence, this argument is sound, and no error was committed in receiving that. The declarations to him by Mrs. Clark were fixed at a time antecedent to her conversation with Tatman, but the record does not show a like state of facts in reference to the declarations to Kellogg and the Hoovers, and as all of the testimony has been embodied in the bills of exceptions, there are no presumptions favoring the ruling of the court below. These latter declarations do not purport to have been made prior in point of time to the statements testified to by Tatman. It is the general and almost universal rule, that evidence of what the witness has said out of court cannot be

*Witness narrating facts differently at different times; general rule; exception.* received to fortify his testimony. Corroborative statements of this character are very easy of manufacture, and, if admitted, might oftentimes be made the means of great imposition. To this general rule,

however, there are exceptions. Thus, when a witness is charged with giving his testimony under the influence of some motive prompting him to make a false or colored statement, then it may be shown that he made similar declarations at a time when the imputed motive did not exist; and where there is evidence in contradiction, tending to show that the account of the transactions given by the witness is a fabrication of a late date, it may be shown that the same account was given by him before its ultimate effect and operation, arising from a change of circumstances, could have been foreseen. ( Whar. on Ev., vol. 1, § 570; *Robb v. Hackley*, 23 Wend. 49; *People v. Finnegan*, 1 Parker's Crim. Rep. 147; *Dailey v. State*, 28 Ind. 285; *Conrad v. Griffey*, 11 How. 480; 2 Phillips, Cowen & Hill's notes, 979.)

Within the exceptions, the declarations made to Guffey were admissible, as tending to support the original testimony of Mrs. Clark, that she recognized Petty at her house immediately after the shooting, and so stated before she saw Tatman on that day. The evidence of Kellogg and the Hoovers has not been brought within these exceptions. For aught that appears to us, these declarations were made subsequently to the conversation with Tatman. If so, they would not contradict his testimony nor support the original testimony of Mrs. C. Being incompetent, unless within the exceptions, and not being shown within said exceptions, we are under the necessity of declaring the court erred in admitting them. All the declarations of Mrs. Clark to these witnesses should have been confined to a time prior to Tatman's visit and conversations at the house. Such declarations, to have been admissible, must have been clearly made antecedently to the conversation with Tatman. The facts that Kellogg stated the declarations to him were made the day of the homicide, and that the Hoovers fixed the time of their conversations on the evening that Clark was killed, in no manner establish these declarations prior to Tatman's alleged suggestions to Mrs. Clark.

The point is further made, that the indictment does not

charge murder in the first degree. Within the authority of *Smith v. State*, 1 Kas. 365, this point is not well taken, as the language of the indictment construed together clearly imports that the killing was willful, deliberate and premeditated.

For the error in receiving incompetent testimony, the judgment of the district court will be reversed, and a new trial awarded. The appellant will be returned from the penitentiary, and delivered over to the jailer of Greenwood county, to abide the order of the district court of that county.

All the Justices concurring.