YOUNG B. BOYD *v.* STATE OF MISSISSIPPI.

1. CRIMINAL LAW.    *Murder.    Poisoning.    Evidence.    Declarations res jestae.    Symptoms of suffering.*

In a prosecution for murder by poisoning the declarations of the deceased describing the symptoms of her then present sufferings are admissible in evidence, but a narration of the symptoms of past sufferings is inadmissible.

2. SAME.    *Chemical experiments.*

On a prosecution for murder by poisoning with arsenic where a physician, as a state's witness, produced several bottles which he testified contained the medicines which he had prescribed for the deceased during her last illness and showed the effects of arsenic on each of them, changing the color of the liquids, it was error to permit the state to prove that defendant, during the last illness of deceased, gave her a punctured orange, which she refused to eat, from which juice oozed of a color like one of the medicines with which arsenic had been mixed, in the absence of evidence showing that the orange contained poison or that any of the medicine taken by deceased had been changed in color.

3. SAME.

In a prosecution for murder by poisoning, it having been shown that deceased had been taking certain dyspepsia medicine and that the bottle containing the medicine had been kept on a shelf, in a room to which a number of persons had access, it was error to permit a witness to testify that the deceased told him, in the absence of the defendant, where she had placed the bottle of medicine, that when witness looked for it there it had been moved, and that it was afterwards found on another shelf, hidden by other bottles, having in it a liquid containing poison and of a different color from the medicine.

4. SAME.

Where the theory of the state was that defendant had poisoned his deceased wife in order that he might continue illicit relations with another woman, and there was no evidence whatever tending to show that such woman was in any way implicated in administering any poison to deceased, an instruction that the

jury should convict if they believed beyond a reasonable doubt that defendant mixed the poison, "or procured it to be done by another," was erroneous.

5. SAME.

Where the theory of the state was that defendant had poisoned deceased, it was proper to permit evidence that defendant had disputed the statement of a witness at the preliminary examination to the effect that defendant had purchased poison from witness.

6. SAME.

On a prosecution for murder it was error to admit evidence that accused did not testify before the justice who conducted the preliminary examination.

7. SAME.

On a prosecution for murder it was error to permit a witness for the state to testify that he had testified to the same facts at the preliminary examination.

8. SAME. *Dying declaration.*

In a prosecution for murder by poisoning, one of the theories of the defense being that deceased poisoned herself, a statement by the deceased, made while in extremis and knowing that she was about to die, in answer to an inquiry by her attending physician as to whether she had taken anything into her stomach, in these words, "The Lord is my witness, I have taken nothing except what you gave me," is admissible as a dying declaration.

9. SAME.

In such case it is inadmissible to prove that, just before the dying declaration was made, the physician told deceased that her husband, the defendant, was under suspicion, and that she should state whether she had so taken anything.

FROM the circuit court of Copiah county.

HON. ROBERT POWELL, Judge.

Boyd, appellant, was tried and convicted of murder by poisoning his wife, and appealed to the supreme court. The opinion states the case.

*M. S. McNeil,* and *A. C. McNair,* for appellant.

The evidence is not sufficient to sustain a conviction. There is nothing in the testimony, in the first place, to show, beyond a reasonable doubt, that the good woman died of poison. But if that was shown, it is not shown that Boyd was the criminal agent. The testimony of those conversant with the true inwardness of the relation between Boyd and his wife discloses that Boyd's conduct and treatment of his wife was kind. In this case no outbreaks of abuse and quarreling are displayed. While it is not proved, the fact, if it be a fact, that he may have been infatuated with Mrs. Artman is not a sufficient motive, on the showing in his case, for the poisoning of his wife. Neither is the fact that there was a life policy on the life of Mrs. Boyd, in his favor, for $1,000, sufficient. All such testimony only tended to inflame and mislead the jury, and was under the facts in this case highly prejudicial to the defendant. The testimony of the witnesses as to the conduct and relations of Boyd and Mrs. Artman was admitted to show motive on part of Boyd for poisoning his wife. This is true, too, as to the orange, and the policy of insurance on her life in Boyd's favor. This testimony was wholly inadmissible on this line, and was highly hurtful to defendant. The test as to the admissibility of evidence to show motive is: "Does the testimony fairly tend to raise an inference in favor of the fact proposed to be proved?" If it does, it is admissible; otherwise, it is not. 15 Am. & Eng. Ency. Law (1st ed.), 93.

The alleged dying declaration was inadmissible. It consisted partly of the statement of Dr. Dampeer that the deceased was suffering from a poison, and that her husband was suspected of administering the poison to her. Dying declarations are the statements of the party dying, and not of some one else. Dampeer's statement that she was suffering from a poison was an opinion of his, an assumption of one of the vital facts in the case, and in connection with his statement, that her husband was suspected of poisoning her, largely contributed to, if it

did not procure, the conviction.  The statement of Mrs. Boyd in response to Dr. Dampeer's suggestion that she was poisoned by her husband, that "the Lord was her witness that she had taken nothing except what you have given me," was not in the nature of a dying declaration.  But if it were, the circumstance attending it rendered it inadmissible.  Its only tendency and effect was to prejudice the defendant's case in the minds of the jury.  If the appeal depended on this alone, the case should be reversed.

*William Williams,* attorney-general, *R. N. Miller,* and *R. B. Mayes,* for appellee.

Looking at the assignments of error by appellant, it seems they are all purely formal and do not indicate any particular point relied on.  We deem it unnecessary to notice but two of them; the first is as to the admissibility of the evidence as to Boyd's intimacy with Mrs. Artman, and also Mrs. Boyd's jealousy.  To show motive, which is one link (not necessary, it is true), but always a proper link when it can be established, and an important one in every case of circumstantial evidence, in this kind of case, to show motive for murder, it is always admissible to show relations of the parties; and in order to do this the evidence of hostile relations with his wife on Boyd's part was proper.  It was also proper to show his fondness for the Artman woman, between himself and whom stood his wife, and that he would be anxious for her removal on this account.  The following citations of case law on this subject are deemed sufficient—viz.: *Webb* v. *State,* 73 Miss., 456; *Weyrich* v. *People,* 89 Ill., 98; *People* v. *Scott,* 153 N. Y., 46; *State* v. *Duestrow,* 137 Me., 266; *State* v. *Chase,* 68 Vt., 405; *Brunson* v. *State,* 124 Ala., 37; *Fraser* v. *State,* 55 Ga., 325 (112 Mich., 291); Underhill Cr. Ev., secs. 90 and 323; *State* v. *Seymore,* 94 Iowa, 699; *Phillips* v. *State,* 62 Ark., 119; *Painter* v. *People,* 147 Ill., 444; *People* v. *Colvin,* 118 Cal., 349; *People* v. *Buchanan,* 145 N. Y., 1; *Boyle* v.

*State,* 61 Wis., 441; *Siberry* v. *State,* 149 Ind., 684; *Thiede*
v. *Utah Ter.,* 159 U. S., 510; *People* v. *Decker,* 157 N. Y.,
186; Underhill Cr. Ev., sec. 333; *Spears* v. *State,* 56 S. W. R.,
347; *State* v. *Reid,* 50 La., 990 (24 S. W. R., 131); *State* v.
*Larkin,* 11 Nev., 314; *Cue* v. *Com.,* 78 Pa. St., 185; *People* v.
*Benham,* 160 N. Y., 402 (55 N. E. R., 11); Cr. Law & Pro.,
by Hughes, secs 138 to 142; *Miller* v. *State,* 68 Miss., 221;
*State* v. *Reed,* 53 Kan., 767 (42 Am. St. R., 323); *State* v.
*Watkins,* 9 Conn., 47 (21 Am. Dec., 712). This last leading
case on very point.

Second, as to the dying declarations of Mrs. Boyd. A dying
declaration is the "statement of the victim of crime of any
circumstance, which, if the party were living, would be relevant
and admissible on the issue as to the cause or manner of such
victim's death." We need cite only the case of *Lipscomb* v.
*State,* 75 Miss., 559, in support of this definition and of the
admissibility of Mrs. Boyd's declaration.

All the preliminaries were shown—that is, that she was fully
conscious of impending, immediate dissolution, had so stated,
that she was going to die, and had made all her dispositions
to that solemn end, and she then said: "As the Lord is my wit-
ness, I took nothing except what you (the doctor) gave me."

This was the expression not of a mere opinion, but of a
relevant fact. Boyd's defense hinted at in his conver-
sation with Dr. Dampeer was suicide, and of course it was
a very pertinent fact to know if she had taken poison volun-
tarily. If she had not died and Boyd were on trial for assault
and battery with intent to murder by giving her poison, of
course it would have been relevant and proper to ask her if she
had herself taken poison. This is the test as held in the Lips-
comb case, *supra.* She was told Boyd was suspected of her
murder, and asked to exonerate him if she had taken poison
voluntarily, and her testimony in the form of dying declaration
was entirely proper.

Argued orally by *A. C. McNair,* and *M. S. McNeil,* for appellant, and by *R. N. Miller,* and *William Williams,* attorney-general, for the appellee.

TRULY, J., delivered the opinion of the court.

On the night of the 29th of November, 1902, Mrs. Annie Boyd died of acute gastritis. An autopsy disclosed the fact, according to the testimony of the analytical chemist, that her death was superinduced by arsenical poisoning. Appellant, the husband of the deceased, was indicted for her murder, and upon trial was convicted, sentenced to the penitentiary for life, and from that judgment prosecutes this appeal.

The testimony adduced at the trial was purely circumstantial. The theory upon which the prosecution proceeded was that the appellant had poisoned his wife through a desire to effect her death so that he might procure the proceeds of a policy of insurance on her life and continue an illicit intimacy with one Susan Artman. The following state of facts was developed by the testimony: Boyd was a candymaker, conducting a candy and fruit stand. His household consisted of himself, his wife, and one small child, and a cousin of his wife, a schoolgirl some sixteen years old, named Nora McDaniel. The family occupied rooms adjoining Boyd's fruit stand. Artman and his wife, Susan, lived in an adjoining building, where the husband conducted a bakery. The rear premises of each house was in a yard common to both. Boyd and Susan Artman soon became friendly, and in constant conversation, Boyd devoting considerable attention to her, to the exclusion to some extent of his wife, though the testimony failed to positively disclose any criminality in this intimacy. Mrs. Boyd was much distressed, and brooded over this intimacy, and intimated on several occasions that she contemplated suicide. Nora McDaniel testified that when she returned from school on Monday preceding the Saturday night on which Mrs. Boyd died she found Mrs. Boyd sick from nausea, vomiting incessantly, and seemingly in in-

tense pain. A doctor was called in, prescribed several remedies, which were continued during the week and until her death. After this spell on Monday, Mrs. Boyd seemed to rally, and on Thursday was so much better that she was able to be out of bed. On Friday morning she suffered a relapse, and from that time until her death lingered in constant and excruciating pain. During the course of the treatment of the case the attendant physician prescribed several different medicines, which were administered generally by Miss McDaniel, though occasionally by the doctor and by Boyd himself. None of these prescriptions, if correctly compounded, contained poison in any form. For some time prior to the attack on Monday, Mrs. Boyd had been taking another medicine for dyspepsia, from which she was a sufferer. On Friday before Mrs. Boyd's death, the appellant asked the attending physician if he did not think his wife had been poisoned; that he (appellant) suspected that she had taken poison on account of jealousy of Susan Artman. Shortly after the death, while appellant was in the room, sitting on the bed with his dead wife, he was arrested, and carried to another place, where he remained under guard. While under arrest he inquired of the officer who had him in charge for what he was being held. The officer replied for the poisoning of his wife, whereupon the appellant remarked that he suspected that his wife was poisoned even before the doctor had discovered it. It was testified to by a clerk in a drug store that appellant, the week before this death, had purchased a package of poisonous mixture containing arsenic and called "Rough on Rats," and the contention of the state was that this was the poison administered to Mrs. Boyd. It was further in proof that no one had access to the premises occupied by the Boyd family except his own household and the Artmans, with the possible exception of a lady who occupied rooms in another portion of the same building. Appellant did not testify on the trial. During the progress of the trial many objections were made and

exceptions reserved to the introduction of testimony on behalf of the state.

1. Nora McDaniel and the attending physician, Dr. Dampeer, were each permitted to relate in their testimony the statements made by Mrs. Boyd in reference to what caused her attack on the Monday preceding her death. They stated that Mrs. Boyd told them that, after eating a hearty dinner on Monday, she had taken a dose of her dyspepsia medicine, the last dose in the bottle, and that shortly thereafter she had been taken with nausea and cramps. This was error, plain and palpable. It is well settled that the statements of a party describing the symptoms of the suffering being endured at the time of the statements are admissible, but the testimony now being reviewed does not come within the scope of that rule. Mrs. Boyd was not stating the symptoms which she was then suffering, but was narrating a past transaction, was detailing the circumstances under which she began to experience the suffering, and giving her opinion of the causes which produced her condition. This comes expressly within the condemnation of this court in *Field* v. *State,* 57 Miss., 474 (34 Am. Rep., 476), where the whole subject is lucidly treated.

2. The doctor who had treated Mrs. Boyd produced before the jury several bottles, which, according to his testimony, contained, accurately compounded, the different prescriptions which he had given to Mrs. Boyd, and he was permitted to show the effect that Rough on Rats would have on the liquids in each of the bottles—changing the color of the various medicines in proportion to the amount of Rough on Rats mixed therewith. In connection with this evidence Nora McDaniel was permitted to testify that on the Sunday preceding the death Boyd, in accordance with his usual custom, brought his wife at the breakfast table an orange; that on this occasion the orange had been punctured, and that the juice which oozed out of the hole was of such a peculiar color that Mrs. Boyd refused it, and that witness also declined to eat it, and was allowed to give as her

reason that she suspected there was something wrong with it; that the orange was not eaten, but in some way mysteriously disappeared. The witness was also allowed to state that the juice which came from the orange corresponded in color with one of the medicines in which the poison had been mixed. This was error of the gravest kind. There was no evidence before the jury that the orange contained any poisonous substance. There was no testimony that any of the medicines taken by Mrs. Boyd during her last sickness had in any wise been changed in color. The effect of this incompetent testimony was to allow, if not to induce, the jury from the bare proof that the admixture of poison would cause a change of color, to leap to the conclusion that poison had been mixed, and yet the witness for the state emphatically and repeatedly denied any knowledge of any change in any of the medicines taken by or administered to the deceased.

3. The only evidence of poison discovered beyond that disclosed by the autopsy was found in a vial, which it was shown had originally contained the dyspepsia medicine, the last dose of which was taken on the Monday preceding the death, and which, according to the improperly admitted statement of Mrs. Boyd, was the cause of her first attack. This vial was kept on a shelf in the kitchen, to which room it was shown no one had access save Boyd, Mrs. Boyd, Nora McDaniel, and the Artmans. During the continuance of Mrs. Boyd's illness, Nora McDaniel, at the request of the doctor, searched for this vial, but, being unable to find it, she was permitted to state that Mrs. Boyd told her where she (Mrs. Boyd) had placed the vial. She was further allowed to testify that the vial had been moved from the place; that she had not moved it; and that she afterwards found it on another shelf, surrounded and hidden by other bottles, still containing a small quantity of a clear liquid different in color from the original compound, and which it was shown contained arsenic. We are unable to comprehend upon what principle the court permitted the witness to repeat to the

jury the statement made by Mrs. Boyd, not in the presence of the appellant, as to what disposition had been made of the bottle. The damning effect of the testimony becomes manifest upon a moment's reflection. Here was a bottle which originally contained medicine, but in which poison was found, secreted in a room to which only the household of Boyd and the Artmans had access. The witness not only testified that she did not personally remove the bottle, but she was further allowed to repeat the statement of Mrs. Boyd—another of the persons having access to the room—as to where she had placed it. By this improper process of exclusion it was driven home to the jury that, as the bottle had been moved, and as poison had been placed therein, and as two of the persons were shown not to have moved it, no one remained who possibly could have been the active agent except the appellant or Mrs. Artman, who it was argued was his paramour, or her husband, who it is not contended was even suspected of complicity.

4. To accentuate this improper testimony the state was granted an instruction, by which the jury were told that they should convict the defendant if they believed beyond a reasonable doubt that he himself mixed the poison, or "procured it to be done by another," with the intent that it. should be taken by his wife, and it was so taken, and caused her death. The effect of this instruction was to say to the jury that, even though the evidence might fail to prove defendant's direct connection with the crime, they should nevertheless convict if they believed that he had procured Susan Artman to mix this poison, yet the record is absolutely devoid of a semblance of proof that Susan Artman was in any manner implicated in administering the poison. This instruction injected into the minds of the jury the unsupported suggestion that appellant had procured in some unexplained manner some other person to administer poison to his wife. It presented to the jury two theories—one wholly unsupported by proof; the other predicated entirely upon evidence purely circumstantial in its character.

5. It was clearly admissible to show that Boyd disputed one of the witnesses at the preliminary investigation, and denied the statement that he had purchased Rough on Rats from the witness.    But a majority of the court think it was error to admit proof that appellant did not testify before the justice of the peace who conducted the preliminary investigation; that he was not put on the stand as a witness, and did not go on voluntarily. It is true that this action of the court was condemned as error in *Bunckley* v. *State*, 77 Miss., 540 (27 South., 638), but the writer hereof is not satisfied of the soundness of that decision, and would not, on this ground alone, consent to a reversal of the judgment herein.

6. The witness who testified that he had sold the Rough on Rats to appellant was permitted on the trial in the circuit court to state that he had testified to the same fact at the preliminary examination.    This effort to corroborate the sole witness by whom it was shown that appellant had possession of poison by proving that he had testified to a similar statement upon a different occasion is so plainly erroneous as to scarce require citation of authority.    It is never competent to attempt to corroborate a witness by proving affirmatively that on other occasions he had made statements which harmonize with his testimony then related to the jury.    The testimony is delivered under the sanctity of an oath, and carries such weight as the jury may attach to it.    If intrinsically of doubtful worth or little force, proof that it is mere repetition increases neither its value nor its force.    Wharton, Cr. Ev., par. 492; *Williams* v. *State,* 79 Miss., 555 (31 South., 197).

7. The attending physician, over the objection of defendant, testified that on Saturday evening, a few hours before Mrs. Boyd's death, she made to him a dying declaration, which was as follows, as the same appears in the record: "I told her she was very sick, and suffering from some poison, and she remarked, 'Yes, I am going to die.'    I told her her husband was under suspicion, and it was her duty to tell us if she had taken

anything herself, and she promptly replied, 'The Lord is my witness, I have taken nothing except what you gave me.'"
That portion of the statement attributed to Mrs. Boyd was properly admitted on this theory: One of the hypotheses deducible from the testimony was that Mrs. Boyd took the poison knowingly, with the deliberate intention of committing suicide. As her language in the dying statement impliedly, if not expressly, contradicted the suggestion of suicide, it was competent, because it tended to eliminate one hypothesis from the case. This part of the statement meets all the tests which render a dying declaration admissible. It was made under a sense of impending dissolution. It was not the mere expression of an opinion, but was the statement of a fact, and could have been given in evidence had the party lived and the defendant been on trial for an attempt to poison. In either event the material inquiry must have been, "Who administered the poison?" If living, Mrs. Boyd would have been a competent witness to deny that she had knowingly taken it. Being dead, her dying declaration was admissible for the same purpose. But the admission should have been restricted to the language used by Mrs. Boyd. In and of themselves by no rational interpretation can her words be distorted into an accusation of her husband. Her meaning, so far as can be gleaned, was simply this: "I am going to die, but the Lord is my witness, I have taken nothing but what you, my physician, gave me." This was not a charge of guilt against appellant. Lying then in the throes of a painful death, the suffering woman, soon to be ushered into eternity, solemnly calls that Deity, in whose presence all must stand, to witness that she has not violated "His canon against self-slaughter." It was error to admit that portion of the dying declaration where the witness, the attending physician, states: "I told her her husband was under suspicion, and it was her duty to tell us if she had taken anything herself." This was incompetent. It was a mere expression of an unsworn opinion of the witness, based upon suspicion only; yet it was introduced before the

jury, clothed with the sanctity of the solemn circumstances which render a dying declaration admissible. If Mrs. Boyd came to her death by poison, the sole remaining question for the consideration of the jury was, "Who is guilty?" The identity being established, the guilt followed of course. The defense of appellant was, not that the party committing the act was not guilty, but that he was not the guilty actor. It was error to place on the defendant, circumstanced as he was, charged with a most atrocious crime, the burden of having to combat this expressed suspicion of the attendant physician upon the crucial question of his defense, the vital point in the case. The dying declaration should have been limited to the statement made by the dying person, upon whose mind the knowledge of impending dissolution weighs with such gravity as to obviate the legal necessity of an oath. Restricted to the language used by Mrs. Boyd, the jury might reasonably have considered her statement as simply an earnest denial of her own guilt and a rejection of the suggestion made by the doctor. But when her words, uttered under such circumstances, are permitted to go to the jury linked and blended with the suspicion of guilt voiced by the physician who had ministered to her dying needs, they are no longer simply a protestation of her own innocence, but become an accusation from the silent lips of a poisoned wife against a faithless husband. The far-reaching and damaging effect of this admission cannot be overestimated.

After repeated and protracted examination of this record, after the testimony has been carefully scanned many times, we are unable to say that the appellant was granted that fair and impartial trial guaranteed by our law, and we are not able to affirm with confidence that the testimony erroneously admitted may not have contributed to the result. In cases of this character, where the very atrocity of the crime is often of itself sufficient to array public sentiment against the unfortunate accused and place him almost beyond the pale of human sympathy, courts should be only the more scrupulously careful

in guarding in every just manner the rights and privileges to which he is entitled.

*Reversed and remanded.*