No. 37,825

STATE OF KANSAS, *Appellee*, v. WILLIAM S. FOUTS, *Appellant*.

(221 P. 2d 841)

Opinion filed August 31, 1950.

*Payne H. Ratner* and *Eugene L. Pirtle,* both of Wichita, agued the cause, and *L. E. Goodrich, Jack L. Goodrich,* both of Parsons, *Ora D. McClellan, Louise Mattox* and *Mearle D. Mason,* all of Wichita, were with them on the briefs for the appellant.

*J. Logan Shuss,* county attorney, and *Edward Rooney,* of Topeka, argued the cause, and *Harold R. Fatzer,* attorney general, *C. Harold Hughes,* assistant attorney general, and *John F. Amos,* assistant county attorney, were with them on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, J.:   This is an appeal from a conviction of murder in the second degree.

On the morning of April 22, 1949, Grace Nutt, who was thirty-six years of age and living with her husband, William H. Nutt, was murdered in her farm home on highway No. 160, 10 miles east of Parsons, Kan., in Labette county, between the hours of 8:20 a. m. and 10:20 a. m.  Her death, which occurred at 1:20 p. m. on that day, was the direct result of two shots fired from a 38-caliber pistol. Under the evidence there can be no question but what the person who killed her came to the home and found Mrs. Nutt in the kitchen at a time when the screen door of that room precluded ready entrance because it was fastened by a hook.  The first shot, which grazed Mrs. Nutt's right temple and knocked her down, was fired through the screen door before an attempt was made to enter the kitchen,  Thereafter, whoever fired it forcibly opened the door, entered the kitchen, and then at close range fired a second and fatal shot into the back part of her head.  There were no eye witnesses to the crime and Mrs. Nutt who remained unconscious until she died was unable to identify her assailant.

What has just been related is not in controversy. We turn now to facts that are, pausing as we do so to state that extended reference to the sordid factual situation disclosed by the evidence will neither benefit posterity nor add anything to this opinion and point out that for that reason our review of the record will not only be summarized but is intended only to include such facts as are absolutely essential to a discussion of errors assigned as grounds for reversal of the judgment.

Within a short time after Mrs. Nutt's death the law enforcement officials of Labette county issued a pickup order to take the defendant, William S. Fouts, who was a married man, fifty-three years of age, living in Parsons, and engaged in the gasoline transport business, into custody for questioning concerning the murder. He was apprehended about 4 p. m. of the day of the tragedy at his home where he had changed the clothes he had been wearing earlier in the day. Later he was charged with the crime of murder in the first degree to which charge, when arraigned, he entered a plea of not guilty.

In due time the cause came on for trial. A fair statement of the essential facts disclosed by the record, limited as we have heretofore indicated, can be stated as follows:

Beginning sometime in 1940, and continuing up until the day before the murder, the defendant and the deceased had been carrying on what they thought was a secret affair. Meetings between the two in the country and elsewhere in the community were frequent and concededly illicit. Apparently the relationship was congenial and restricted to the two until sometime in 1948 when Mrs. Nutt commenced to tire of the arrangement and bestow some of her affections upon other and younger men. The defendant became aware of the situation and commenced to trail the decedent. At times he complained of her conduct. On the afternoon of April 21, 1949, the day before the murder, and between the hours of 4 p. m. and 5 p. m., he caught her and a truck driver, one Vermillion, parked along a country side road several miles distant from her home. He drove up and engaged the pair in conversation. Twice Vermillion told the defendant, who appeared nervous and upset, to go away and leave the woman alone but he did not go. After some argument, during which Mrs. Nutt became somewhat nervous and agitated, and was observed to have been crying, the truck driver drove away leaving her alone with the defendant. There can be no

question but what a quarrel ensued. However, it is apparent there was a reconciliation for later in the afternoon the defendant got into Mrs. Nutt's car and they were observed there by another neighboring farm lady, who drove by and saw them in each other's arms. Thereafter Mrs. Nutt went to the home of her sister in Parsons for the purpose of obtaining some tomato plants for her garden. Her sister testified that she appeared to be nervous and excited. Later on, and. on the same evening, her husband testified she appeared to be nervous and apprehensive. These facts had been communicated to the officers of Labette county before they issued the pickup order for the defendant.

When taken into custody for questioning the defendant was interrogated at considerable length. He denied all knowledge of the crime and finally signed a verified statement wherein he (1) stated that his truck driver Anderson was with him all the time on the morning of the homicide from 7:15 a. m. to 12:20 p. m., (2) denied he had ever had intimate relations with Mrs. Nutt, and (3) stated the only time he had seen her on the day preceding her death was at the hour of 10 o'clock in the morning. At the trial he repudiated his statement about having been with Anderson all of the morning of April 22 and admitted that he left the latter in Parsons that morning and proceeded alone past the Nutt home shortly after 7 a. m. in his gasoline transport truck to Bronson's Service Station north of McCune, located about four miles east and two miles north of such home, and that in returning to Parsons, also alone, he drove back past the Nutt home again, reaching Parsons in time to put in a telephone call at his own home to the Nutt home at 9:24 a. m. He said no one answered the call. His explanation for the call was that things did not look right at the Nutt home as he drove by it and that Mrs. Nutt had told him any time they did not she wanted him to check and then notify her sister, Mrs. Gunter. However, it is significant that when he received no answer to his call he made no attempt to investigate further and did not call the deceased's sister as he said he had agreed to do. On cross-examination he admitted he had had intimate relations with Mrs. Nutt on many occasions. During the trial he also admitted his statement to the effect he had seen her but once on April 21, and then in the morning, was false and, while he continued to deny there had been any quarrel between them, admitted he was present and participated in the Vermillion, Fouts, Grace Nutt incident to which we have heretofore referred.

The day following the homicide the defendant was advised the officers were going to take a paraffin test of his hands for the purpose of ascertaining whether such test would reveal gunpowder nitrate burns. While preparations were being made to make this test, and after he had been advised of its nature and purpose, he volunteered the statement that recently he had engaged in target practice at his brother-in-law's place at Edna where he had fired a pistol and a rifle. Nevertheless the officers proceeded with the test which, according to the testimony of persons who had experience in making such tests, disclosed nitrate on the defendant's right hand. Thereafter the officers investigated his target practice story and found it to be false. In fact at the trial he admitted its falseness.

In addition to the facts heretofore set forth the record reveals: That the defendant made divers other statements pertaining to his whereabouts on both April 21 and 22 which he later admitted were untrue; that one Garrettson, a witness for the state, testified that while fixing a flat tire on his automobile the defendant passed him on the highway between 9:30 a. m. and 10 a. m. on the morning of the murder driving east in the direction of the Nutt home which was located slightly more than a half mile on down the road; that another witness, Maude Mullen, a neighbor who lived a short distance from the Nutt home, testified that on the morning of the murder she saw an oil truck headed west standing, not traveling, on the north side of the highway near the Nutt home and that while she could not swear as to the hour she saw it there, her judgment was that it was between 10 a. m. and 10:30 a. m. although it might have been before; and that a chemical analysis disclosed at least one spot of human blood on the trousers the defendant was wearing on the morning of the murder.

In the face of the foregoing evidence and other testimony supporting it, purposely omitted for reasons heretofore stated, the defendant demurred to the state's evidence on the ground it did not prove or tend to prove any violation of any of the criminal laws of the state. When this demurrer was overruled he introduced his evidence. Thereafter at the close of all the evidence he moved for a directed verdict on the ground such evidence failed to prove a violation of the law on his part beyond a reasonable doubt and was not sufficient to support a verdict of guilty if one was returned by the jury. This motion was also overruled. Thereupon, the trial court prepared and submitted to counsel its proposed instructions, included in which was an instruction dealing with the crime of mur-

der in the second degree. Defendant then requested the court to eliminate such instruction and objected to any instruction whatsoever having to do with, or making reference to, murder in the second degree. This objection was also overruled and the cause was submitted to the jury which, as has been heretofore indicated, returned a verdict finding the defendant guilty of murder in the second degree. Ultimately the trial court approved such verdict and rendered judgment thereon. Defendant then perfected this appeal.

Appellant's first claim of error is that the trial court erred in overruling his demurrer to the state's evidence and in denying his motion for a directed verdict. This claim is based entirely upon the proposition the evidence relied on for conviction was circumstantial and not sufficient to uphold a verdict of guilty.

The instructions of the court relating to the weight to be given this type of evidence by the jury are not included in the record, hence we must assume it was properly advised with respect thereto. In fact no claim is made to the contrary. Under such circumstances the rule in this jurisdiction is well established.

Long ago in *State v. Hunter,* 50 Kan. 302, 32 Pac. 37, we held:

"A conviction may rest upon circumstantial testimony alone, but the facts and circumstances must be such as are absolutely incompatible upon any reasonable hypothesis with the innocence of the accused, and incapable of explanation upon any reasonable hypothesis other than that of the guilt of the accused. However, where such testimony fairly tends to show the guilt of the defendant, the weight of the same is for the jury; and where the jury has found, after being properly instructed, that the defendant is guilty, and the verdict has been approved by the trial court, it will not be disturbed because of the insufficiency of the evidence." (Syl. ¶ 1.)

See, also, *State v. Murphy,* 145 Kan. 242, 65 P. 2d 342, which holds:

"When considering on appeal the sufficiency of circumstantial evidence to sustain conviction of crime, the question before this court is not whether the evidence is incompatible with any reasonable hypothesis except guilt. That was a question for the jury and the trial court, and the function of this court is limited to ascertaining whether there was basis in the evidence for a reasonable inference of guilt, following *State v. Brizendine,* 114 Kan. 699, 220 Pac. 174." (Syl. ¶ 4.)

Under the facts and circumstances disclosed by the record in this case we have little difficulty in holding there was basis in the evidence for a reasonable inference of guilt on the part of the appellant. It follows the trial court did not err in overruling either the demurrer or the motion for a directed verdict.

One of appellant's defenses was that someone else committed the crime. It is suggested that because the state failed to conclusively establish that other persons, particularly the deceased's husband and other truck drivers with whom she had been having affairs, did not commit the crime the evidence does not sustain either the verdict or the judgment. The suggestion has little merit. See *People v. Spaulding*, 309 Ill. 292, 141 N. E. 196; *State v. Aiken*, 215 N. C. 317, 1 S. E. 2d 821, holding the mere possibility the deceased might have been killed by someone other than the defendant need not be negatived by the state in a prosecution for murder, and other authorities (*Smith v. Commonwealth*, 185 Va. 800, 40 S. E. 2d 273; *Price v. State*, 207, Miss. 111, 41 So. 2d 37; 26 Am. Jur. 351, § 285; 40 C. J. S. 1130, § 218) supporting the doctrine therein announced. We know of and have been cited to no decisions holding that in order to convict a defendant of murder on circumstantial evidence the state must first eliminate all other persons as possible perpetrators of the crime. Indeed, adherence to any such rule as that suggested by the appellant would simply mean that conviction of crime based upon circumstantial evidence would be impossible.

The next error assigned is that the trial court erred in submitting the jury an instruction on murder in the second degree over the appellant's objection.

Our statute (G. S. 1935, 62-1447) requires the trial court in a criminal action to charge the jury respecting all matters which are necessary for their information in giving their verdict. Under our decisions, construing its terms, we have repeatedly held that in prosecutions for homicide it is the imperative duty of the trial court to instruct the jury not only as to the offense charged—in this case murder in the first degree—but as to all lesser offenses of which the accused might be found guilty under the information and upon the evidence adduced. This, we might add, is the rule, even though the court may deem the evidence supporting the lesser offense to be weak and inconclusive and notwithstanding a request for such an instruction has not been made. See *State v. Severns*, 158 Kan. 453, 148 P. 2d 488; *State v. Phelps*, 151 Kan. 199, 97 P. 2d 1105; *State v. Gloyd*, 148 Kan. 706, 710, 84 P. 2d 966; *State v. Cunningham*, 120 Kan. 430, 243 Pac. 1006.

In the instant case it must be conceded that murder in the second degree is a lesser offense of which the appellant might be found guilty under the information on which he was tried. There were no eye

witnesses to the crime. Under the existing facts and circumstances the jury might well have concluded the murderer of Mrs. Nutt went to her home without premeditated intention of killing her but that after a quarrel in which he was refused admission to the kitchen he became angry and did so without deliberation and premeditation. In such a situation we think it was the trial court's duty to instruct the jury on the crime of murder in the second degree and that its failure to do so would have constituted reversible error. In this connection see *State v. Smith,* 161 Kan. 230, 167 P. 2d 594, where it is said:

"In those cases where self defense is invoked by the proof we conclude it is the duty of the court to charge the jury on that issue irrespective of whether there has been a request for an instruction, regardless of whether counsel has been called upon and failed to formulate a theory on which it could be given, and notwithstanding such counsel has stated he believes its submission rests in the court's discretion." (p. 237.)

The third contention advanced by the appellant as grounds for reversal of the judgment relates to the admission of incompetent testimony and presents a far more serious question than any of those heretofore disposed of.

Maude Mullen, a neighbor lady who lived one-half mile from the Nutt home and who, except for the decedent's husband, was the first person to reach the home after the shooting, was called as a witness for the state. She testified fully as to what she saw and found there. Just at the close of her testimony the county attorney asked her this question "Did you notice anything unusual there at the Nutt home that morning of April 22?" She replied:

"Well, it is very difficult to have a clear vision of their home because there is a creek between our places, and there are some trees, and we can't see the porch, but we can see down the highway."

Without further interrogation attorneys for the appellant were advised they could cross-examine. The following questions and answers appear at the very beginning of Mrs. Mullen's cross-examination:

"Q. You didn't see any cars or trucks or automobiles there, that morning, at the Nutt home? A. I did see a truck—an oil truck on the north side of the road that morning, headed west.
"Q. It was headed west? A. It was headed west.
"Q. And traveling west? A. It wasn't traveling; it was standing."

Obviously surprised at the answers made to the questions he had propounded to Mrs. Mullen the attorney who was cross-examining

her then inquired whether or not she had not been asked a similar question at the inquest and failed to make such a reply. Her answer was she had not been asked the question in that way. Later on re-direct examination in response to further interrogation she stated in substance that if she had been asked such a question she did not understand it and added, "I wasn't asked directly like he [referring to counsel for appellant] did ask me, if I saw a truck there, and there wasn't any way of dodging it." Still later upon recross-examination she was asked the time of day it was when she saw the truck to which she had referred. Her reply was:

"I don't know the exact hour, but I estimate it sometime in the middle of the forenoon. It was some place toward the middle of the forenoon. Maybe I call it forenoon, and you don't, but I should think, probably 10:00 or 10:30, sometime along about that time. I couldn't swear what time it was, because I didn't look at the clock, but just according to my word about it."

Following this statement the following question and answer appears in the record:

"Q. In other words, you saw a truck down the road there about 10:00 or 10:30, according to your best judgment? A. It could have been before. I wouldn't swear to a certain hour."

For some reason unexplained by the record, the state was not content to allow Mrs. Mullen's testimony to stand alone. Following her appearance it called her husband Alfred Mullen as a witness. After preliminary questions and answers, not here material, he was asked this question:

"Answer this question 'Yes' or 'no', and no other way: After you learned of the death of Mrs. Nutt did your wife, on that same day, tell you about seeing a transport truck on the road in the vicinity of that house?"

Appellant's counsel immediately objected to the question on grounds it pertained to a conversation between two people who had no connection with the case and outside the presence of the accused and asked that the witness not be permitted to answer it. On inquiry by the court counsel for the prosecution, apparently conceding the question called for an answer based on hearsay, stated the question was in the same category as a verbal act and therefore proper. Thereupon the trial court sustained the appellant's objection. Notwithstanding this ruling the state reframed the question and asked it again. Appellant objected on the ground it called for hearsay. The state then requested the court hold its ruling on the question in abeyance until it could be argued to the court without the jury being present. This request was granted and the court ad-

journed for the day. The next morning the state still persisted in its position and, after considerable argument, the trial court reversed its former ruling and indicated it would permit the question to be asked and answered by the witness. Thereafter counsel for the state asked Mr. Mullen the following question:

"Did your wife, on the day of the alleged murder of Mrs. Nutt, mention to you the subject of having seen an oil truck parked in the vicinity of the Nutt home? Answer that 'Yes' or 'No'."

Counsel for the appellant made the following objection which was overruled by the trial court.

"Now, if the Court, please, we object to the form of this question on the grounds that it is calling for hearsay testimony on the part of this witness, and was in a conversation which took place between he and his wife privately. It forms no part of the *res gestae* in this action, and is highly prejudicial to the interests of the plaintiff (*sic*) in this case, and it is a conversation which took place outside the presence of Mr. Fouts, and is not relating to the subject matter of this action."

The witness's answer to the question was "yes." Immediately thereafter counsel for appellee stated "you may cross-examine." In response to this statement counsel for appellant announced there would be no cross-examination.

We pause here to state a careful and painstaking examination of the record reveals Mrs. Mullen had not been impeached at the time her husband was permitted to testify as heretofore related. Nor was there any attempt made to impeach her thereafter. The very most that can be said from the standpoint of impeachment is that counsel for appellant by further questions endeavored to weaken the force and effect of her statement about having seen an oil truck parked in front of the Nutt home. However, it is clear no attempt was made to establish the statement as made was fabricated or untrue or that the witness making it was unworthy of belief.

In its attempt to uphold the trial court's ruling in permitting Mr. Mullen to answer the question heretofore quoted the appellee inferentially concedes, if in fact it does not actually admit, that his answer to such question was based on hearsay and therefore incompetent under well established rules of evidence unless within exceptions to the hearsay rule which excludes in general statements made out of court offered as proof of asserted facts. Indeed, without the concession, under rules so elementary and well established they hardly require citation of authorities, we would be obliged to so hold. See, *e. g.*, 31 C. J. S. 919, 940, §§ 193, 200; 20 Am. Jur. 400,

460, 467, 473, §§ 452, 544, 555, 559; Kelly's Criminal Law and Procedure (4th Ed.), 231, § 274; Underhill's Criminal Evidence (4th Ed.), 739, § 386; 2 Bishop's New Criminal Procedure (2d Ed.), 927, § 1081; *Stirn v. Nelson*, 65 Kan. 419, 421, 70 Pac. 355.

Appellee seeks, as it did at the trial, to justify the admission of the testimony in question on the ground it was admissible as a verbal act. Apparently, appellee has an erroneous conception of what constitutes a verbal act. Under the verbal act doctrine, as we understand it, utterances are never to be regarded as verbal acts unless they accompany the conduct to which it is desired to attach some legal effect (See 6 Wigmore On Evidence [3d Ed.], 190, 197, §§ 1772, 1776; 20 Am. Jur. 557, § 664). It is clear from the record in this case the statement made by Mrs. Mullen to her husband was not a verbal act as that term is defined in the foregoing authorities. Mr. Mullen was working in the field at the time his wife claims to have seen the oil truck in front of the Nutt house and it is undisputed her statement to him with respect thereto was made several hours thereafter.

In its briefs and on oral argument in this court appellee contends Mr. Mullen's testimony was admissible for another reason, namely, that there was an attempt made by the appellant to impeach Mrs. Mullen, hence her husband's testimony was admissible for the purpose of rehabilitating her status as a witness.

Before disposing of this contention it will be well to turn to the authorities for the purpose of determining just when hearsay testimony is admissible for the purpose of rehabilitating a witness.

The general rule is that prior statements of a witness, consistent with his testimony at the trial, are not admissible in corroboration of his testimony unless the witness has been impeached and then only for the purpose of rehabilitating him.

The rule is well stated in 28 R. C. L., Witnesses, § 236, where the following statement appears:

"At cne time the prior statements of a witness consistent with his testimony on trial were received generally in all cases, even where the witness had not been discredited in any way, but in the early part of the 18th century the courts began to see the inconsistencies of this practice, and at the present time, in almost all cases, trials for rape and assaults with intent to ravish being conspicuous exceptions, the courts are virtually unanimous in holding that until a witness has been impeached in some way—until some attack cn his credibility has been made—proof of previous statements by him consistent with and corroborative of his testimony is utterly incompetent and inadmissible in all circumstances. . . ." (p. 652.)

In 70 C. J., Witnesses, § 1369, the rule is stated as follows:

"Although proof of such statements has been held admissible where the witness has, in some way, been impeached or his credibility impaired, as a general rule a witness cannot be corroborated by proof that on previous occasions he has made the same statements as those made in his testimony; . . ." (p. 1183.)

See, also, 22 C. J. S., Criminal Law, §§ 746, 752, which read:

"As a general rule, the conversation and statements of third persons which were not made in accused's presence or hearing, and which are not the declarations of a co-conspirator nor a part of the *res gestae,* are not admissible either for or against accused." (p. 1281.)

"In accordance with the rule discussed in C. J. S. title Witnesses, § 648, also 70 C. J. p. 1184 note 85, that as a general rule a witness cannot be corroborated by proof that on previous occasions he has made the same statements as those made in his testimony, declarations of a witness out of court are not competent for the purpose of corroborating his testimony. . . ." (p. 1287.)

What has been related is sufficient to demonstrate the general rule is as heretofore stated. However, it is interesting to note what other textbooks and legal treatises have to say on the same subject. Mr. Wigmore in his work on Evidence has this to say:

"When the witness has merely testified on direct examination, without any impeachment, proof of consistent statements is unnecessary and valueless. The witness is not helped by it; for, even if it is an improbable or untrustworthy story, it is not made more probable or more trustworthy by any number of repetitions of it. Such evidence would ordinarily be both irrelevant and cumbersome to the trial; and is rejected in all Courts . . ." (4 Wigmore on Evidence [3rd Ed.], § 1124.)

In 20 Am. Jur., Evidence, § 458, it is said:

".. . . Prior statements of a witness are not admissible in corroboration of his testimony, at least until an attack has been made on his credibility. . . ." (p. 405.)

Mr. Wharton in his work on Criminal Evidence states:

". . . The admissibility of previous statements by a witness to corroborate him depends upon whether the witness has been impeached or his credibility impaired. . . ." (Wharton's Vol. 3, Criminal Evidence [11th Ed.], § 1409, p. 2306.)

In 70 C. J., Witnesses, § 983, it is said:

"Where a witness has not been impeached, it is not permissible to support his testimony by showing that he had made previous statements or identifications out of court in conformity to his testimony, that his testimony is consistent with that given by him in a previous proceeding, or before the grand jury, or that he had never made any statements contradictory to his testimony. . . ." (pp. 789, 790.)

See, also, 58 Am. Jur., Witnesses, §§ 819, 821, which read:

"The general rule announced in practically all jurisdictions is that until a witness has been impeached in some way he cannot, except under certain circumstances, be corroborated or his testimony bolstered up or supported by showing that he has made statements out of court similar to and consistent with his testimony on the witness stand. . . . The foregoing rule of exclusion is not confined to civil cases, but is applicable to criminal cases as well. . . . The circumstances that a party has laid the predicate for the impeachment of an opposing witness does not authorize the party proffering the witness to introduce declarations previously made by him in conformity with his testimony. And the fact that a witness has been impeached as to one portion of his testimony does not render admissible prior statements in corroboration of other portions of his testimony not attacked."

"An exception to the general rule that prior consistent statements of a witness are not receivable in evidence to corroborate or support him is generally recognized in the case of an impeached witness, at least where the impeachment takes the form of recent fabrication, bias, interest, or motive to falsify, as distinguished from impeachment by prior inconsistent statements. The common sense of this exception is too strong for the formal objection that the evidence thus received is hearsay. It has been characterized as an exception to the hearsay rule, although some authorities declare this position unsound. . . . It is said that the rule which admits prior consistent statements of an impeached witness should be applied strictly and should not be extended." (pp. 458, 459, 460.)

And, see, 10 R. C. L., Evidence, § 134, which reads:

"Statements made by a witness to other persons are no exception to the hearsay rule. A witness cannot be asked whether she did not say to her sister that a certain person had committed suicide, such testimony being hearsay. Nor can evidence of what a witness has said out of court be received to fortify his testimony. It violates a first principle in the law of evidence to allow a party to be affected, either in his person or his property, by the declarations of a witness made without oath. And, besides, it can be no confirmation of what the witness has said on oath, to show that he has made similar declarations when under no such solemn obligation to speak the truth. . . ." (p. 960.)

Heretofore we have stated that Mrs. Mullen was not impeached and, under the foregoing authorities, conclusively established that under such circumstances it was improper for the trial court to permit Mr. Mullen's testimony relating to what she had told him about the oil truck in front of the Nutt home to go to the jury. Notwithstanding, we pause to give consideration to appellee's contention Mrs. Mullen was impeached by the questions asked her on cross-examination to which we have heretofore referred.

Merely assailing a witness's testimony by cross-examination does not afford an opportunity to corroborate him by proof of previous

consistent statements (See 3 Wharton on Criminal Evidence 2308, § 1410). 70 C. J., Witnesses, § 982, states that a rigid cross-examination does not justify corroborative evidence bearing on the credibility of the witness. The effect of 58 Am. Jur., Witnesses, § 819, heretofore quoted, is that the mere laying of the foundation for impeachment, without following it up and actually impeaching the witness, does not warrant corroboration of the witness by hearsay testimony. See, *People v. Jung Hing*, 212 N. Y. 393, 403, 106 N. E. 105, and *State v. Watson*, 159 La. 779, 106 So. 302. Mr. Wigmore (See 4 Wigmore on Evidence [3rd Ed.], § 1131) states the broad rule in a few courts is that consistent statements may be admitted after impeachment of any sort—in particular after any impeachment by cross-examination. However, he carefully points out that there is no sound reason for such a loose rule. When tested by the foregoing principles we find nothing in the cross-examination of Mrs. Mullen which would warrant us in holding that examination resulted in her impeachment.

Appellee insists that under our own decisions when an attempt is made to impeach a witness the one offering that witness may rehabilitate him, citing *State v. Pitts*, 126 Kan. 784, 271 Pac. 296, as authority for its position. We do not agree with its position or give the decision on which it relies the import it places upon it. It clearly appears from both the syllabus and the opinion in that case that the witness was actually impeached by evidence showing she had made contradictory statements regarding the identity of her assailant. We have no such situation here. When carefully analyzed we think all our decisions, even those (*State v. Hendricks*, 32 Kan. 559, 4 Pac. 1050; *Cloud County v. Vickers*, 62 Kan. 25, 61 Pac. 391, and *Cereal Co. v. Alexander*, 75 Kan. 537, 89 Pac. 923), where corroborating evidence was held to have been properly received, uphold the doctrine that it is error to admit evidence based on hearsay and tending to rehabilitate a witness when such witness has not been impeached. See *State v. Petty*, 21 Kan. 54; *Chapman v. Blakeman*, 31 Kan. 684, 3 Pac. 277; *State v. Keefe*, 54 Kan. 197, 38 Pac. 302; *Stirn v. Nelson*, 65 Kan. 419, 70 Pac. 355, and *State v. Henson*, 105 Kan. 581, 185 Pac. 1059.

The only remaining question is whether the error in admitting Mr. Mullen's testimony was so prejudicial as to require a reversal of the judgment. We have little difficulty in concluding that it does. One important question in this case, under the existing facts

and circumstances, was whether appellant was at the Nutt home on the morning in question and during the hours the crime was committed. Mrs. Mullen, while she did not identify the oil truck, practically placed him there. For all practical purposes the admission of her husband's testimony gave the state two witnesses on that all important question instead of one. In that situation we are forced to conclude the testimony was highly prejudicial and compels a reversal of the judgment.

The books are full of cases supporting the conclusions just announced. Quotations from two of them will suffice to demonstrate the basic theory on which other courts have reversed judgments of conviction because of the erroneous admission of testimony similar to that here in question. *People v. Jung Hing,* 212 N. Y. 393, 106 N. E. 105, holds:

"Where, upon a trial for murder, the issue of identification was close, not because the testimony pro and con was doubtful or uncertain, but because it was so direct and positive as to leave no alternative but to accept it as true or reject it as untrue, evidence that witnesses who testified as to the defendant's identity had given similar testimony in the police station was nothing more than the unsworn confirmation of the testimony of witnesses who had not been impeached except by the usual contradictions inherent in the differing versions of the opposing witnesses, and its reception constituted error of such serious import that it is a sufficient ground for reversal, even though it was allowed to pass at the trial without objection or exception. The evidence improperly admitted had no probative effect upon the credibility of the witnesses, but bore directly upon the all-important issue of identity and may have been so harmful as to support witnesses who without it might not have been believed.

"Assuming that a witness has been so far impeached on cross-examination as to render it proper to resort to her prior consistent statements for corroboration, it is still necessary to show that they were made under circumstances which preclude the probability of their being inspired by others, and where this has not been done, testimony to the effect that prior to the trial the witness had told the same story that she narrated in court is incompetent." (Syl. ¶¶ 1, 2.)

### In *Rogers v. State,* 88 Ark. 451, 115 S. W. 156, the court held:

"In a prosecution for robbery the prosecuting witness cannot be corroborated by proof that two hours after the robbery he stated to a police officer that defendant committed the robbery, nor is such testimony admissible as part of *res gestae.*" (Syl.)

### And in the opinion said:

"The subject of prior consistent statements was recently considered by this court in *Burks v. State,* 78 Ark. 271, where one phase of it was discussed and the authorities reviewed. The court said: 'After all, the effect of proof of

previous consistent statements could only be to corroborate the statement of the witness under oath by his own words uttered on another occasion. It would add nothing to his statement upon the witness stand, either as to his testimony on the main issue, or as to his denial of the contradiction. We are of the opinion that the admission of the testimony by the court was improper and prejudicial, and should not have been allowed'.

"Applying the principles here, it is plain to be seen that the prior consistent statements were inadmissible; and, as their tendency was naturally to reinforce the testimony of the witness prior to an attack upon it, by incompetent testimony, it would ordinarily be prejudicial. It is necessarily so in this case, as the conviction depends solely upon the testimony of Fielder, as against the testimony tending to prove that the defendant was at another place, and could not and did not commit the robbery."

For other decisions to the same effect see *State v. Braniff*, 105 Wash. 327, 177 Pac. 801; *Connor v. The People, etc.*, 18 Colo. 373, 33 Pac. 159; *W. R. Newton v. The State*, 147 Tex. Crim. Rep. 400, 180 S. W. 2d 946; *Gholar v. State*, 203 Miss. 371, 35 So. 2d 706; *Adams v. The State*, 87 Tex. Crim. Rep. 67, 69, 219 S. W. 460; *McKnight v. The State*, 50 Tex. Crim. Rep. 252, 95 S. W. 1056; *Walker v. The State*, 72 Tex. Crim. Rep. 536, 163 S. W. 71; *People v. Collier*, 125 N. Y. S. 725; *Ranck v. Brackbill*, 209 Pa. 499, 58 A. 884; *Mellon v. United States*, 170 Fed. 2d 583; *Hubbard v. Commonwealth*, 174 Va. 493, 6 S. E. 2d 760; *Fuller v. The State*, 196 Ga. 237, 26 S. E. 2d 281; *Boyd v. State*, 84 Miss. 414, 36 So. 525; *State v. Watson*, 159 La. 779, 106 So. 302; *Bennett v. The State*, 160 Ala. 25, 49 So. 296; *Key v. State*, 29 Ala. App. 435, 197 So. 360; *Kerr v. The State*, 31 Ala. App. 203, 14 So. 2d 256.

Appellant's final assignment of error is predicated upon the premise the trial court erred in refusing to grant him a new trial on ground of newly discovered evidence. Since a new trial is required because of error in the admission of evidence it would serve no useful purpose to pass upon that question.

For the reason herein stated the judgment is reversed with directions to grant the defendant a new trial.

It is so ordered.