COURT OF APPEALS,

July 14, 1914.

# THE PEOPLE v. JUNG HING.

(212 N. Y. 393.)

(1.) MURDER—EVIDENCE—IDENTIFICATION.

Where, upon a trial for murder, the issue of identification was close, not because the testimony *pro* and *con* was doubtful or uncertain, but because it was so direct and positive as to leave no alternative but to accept it as true or reject it as untrue, evidence that witnesses who testified as to the defendant's identity had given similar testimony in the police station was nothing more than the unsworn confirmation of the testimony of witnesses who had not been impeached except by the usual contradictions inherent in the differing versions of the opposing witnesses, and its reception constituted error of such serious import that it is a sufficient ground for reversal, even though it was allowed to pass at the trial without objection or exception. The evidence improperly admitted had no probative effect upon the credibility of the witnesses, but bore directly upon the all-important issue of identity and may have been so harmful as to support witnesses who without it might not have been believed.

(2.) SAME—PRIOR INCONSISTENT STATEMENTS.

Assuming that a witness has been so far impeached on cross-examination as to render it proper to resort to her prior consistent statements for corroboration, it is still necessary to show that they were made under circumstances which precluded the probability of their being inspired by others, and where this has not been done, testimony to the effect that prior to the trial the witness had told the same story that she narrated in court is incompetent.

(3.) SAME—WHEN EVIDENCE DENYING THE TRUTHFULNESS OF STATE-
MENTS ALLEGED TO HAVE BEEN MADE BY DECEASED INCOMPETENT.

Where a witness for the defense has testified that the deceased was shot by another than the defendant in a quarrel over a ring

which the deceased stated he had given to a certain girl and which he accused his murderer of having in his possession, testimony of the girl denying the *truthfulness of the statements attributed to the* deceased is improperly admitted. The fact in issue was whether the statement had been made by the deceased and not whether it was true.

APPEAL from a judgment of the Court of General Sessions of the Peace in the county of New York, rendered December 13, 1912, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*William Travers Jerome* and *Hardie B. Walmsley* for appellant. Error calling for a reversal of the judgment herein was committed by the trial court in permitting the People upon the trial to introduce evidence of what occurred in the police station house immediately after the shooting, in respect to the identification of the defendant. (2 Wigmore on Ev. §§ 1040, 1122; Robb v. Hackley, 23 Wend. 50; Jarkins v. City of Hudson, 40 Hun, 424; Dechert v. Municipal Electric Light Co., 39 App. Div. 490; People v. Smith, 172 N. Y. 210; People v. Kennedy, 164 N. Y. 449; People v. Young, 72 App. Div. 9; People v. Smith, 162 N. Y. 520.) The trial court committed error calling for the reversal of the judgment herein in admitting the testimony of Gertrude Williams in reference to the diamond ring. (Wigmore on Ev. § 1768; Cherry v. Slade, 2 Hawks, 400; State v. Wentworth, 37 N. H. 217; Smith v. Whittier, 95 Cal. 279; State Bank v. Hutchinson, 62 Kans. 9; Collins v. Stevenson, 8 Gray, 438; Comm. v. Parker, 2 Cush. 212; Stewart v. Douglass, 9 Cal. App. 712; St. Maries v. Polleys, 47 Wis. 67; Fossett v. State, 41 Tex. Cr. Rep. 400; Wagner v. Commonwealth, 32 Ky. Law, 1185.) In charging the jury upon the question of reasonable doubt, after

the jury had reported that they were unable to agree, the court committed reversible error. (State v. Cohen, 108 Iowa, 208; Carr v. State, 23 Neb. 749; State v. Sauer, 38 Minn. 438; Morgan v. States, 48 Iowa St. 371; Owens v. United States, 130 Fed. Rep. 279; Klyce v. State, 78 Miss. 450; Darden v. State, 73 Ark. 315; Siberry v. State, 135 Ind. 677; People v. Giudici, 100 N. Y. 503.)

*Charles S. Whitman, District Attorney (Robert C. Taylor* of counsel, for respondent. Alleged error in receiving evidence of the identification at the station house, when the four women and Wong Ye laid their hands upon defendant in the line up of thirteen or fourteen Chinamen, was not raised by proper objection and exception. (People v. Tobin, 176 N. Y. 279; People v. Buddensieck, 103 N. Y. 487; People v. Hughes, 137 N. Y. 29; People v. Wiechers, 179 N. Y. 459; People v. Jackson, 196 N. Y. 357; People v. Burgess, 153 N. Y. 561.) The identification evidence was proper. (Wigmore on Ev. §§ 1104, 1122, 1130; Annesley v. Anglesea, 17 How. St. Tr. 1139: Christie's Case, 10 Eng. Cr. App. 141.) It was proper to permit the Faund woman to testify that she had previously told to an assistant district attorney the same story that she told upon the stand. (People v. Vane, 12 Wend, 78; Robb v. Hackley, 23 Wend. 503; Gilbert v. Sage, 57 N. Y. 639; Matter of Hesdra, 119 N. Y. 615; People v. Katz, 209 N. Y. 311.) There was no error in the charge as to reasonable doubt. (People v. Koenig, 180 N. Y. 155; People v. Giudici, 100 N. Y. 503; People v. Tobin, 176 N. Y. 278; People v. Wolter, 203 N. Y. 484; People v. Laudiero, 192 N. Y. 304.)

WERNER, J.:

In the evening of June 17th, 1912, a Chinaman named Yee Toy was shot and killed in Pell street in the county of New

York. The defendant was arrested, charged with the crime of murder in the first degree, held for the grand jury and indicted. He has been twice tried. On the first trial the jury disagreed, and on the second trial he was found guilty. The appeal is from the judgment entered on the verdict. In view of the disposition which we deem it necessary to make of this appeal, we shall discuss only such facts as are germane to the questions presented.

The cause of the decedent's death, the time and place at which it occurred and, to some extent, the manner in which it was brought about, are matters over which there is no sub-stantial controversy. The case of the prosecution proceeded on the theory that the defendant was the person who shot and killed the deceased under circumstances which proved the commission of the crime of murder in the first degree. Seven witnesses testified in support of the charge, and six of them asserted that they were eye-witnesses to the homicide. For the defense there were five witnesses to the shooting who testified that it was not done by the defendant, but by another Chinaman. The defendant and a Chinese companion testified that they heard the shots, but denied that the defendant had anything to do with the shooting. It may be premised, therefore, that the main issue was the identity of the murderer. In view of the close similarity in the character of all the witnesses, except the police officers, and their practically equal division in numbers, it is apparent that any substantial error in the admission of evidence bearing upon the identity of the assailant must be presumed to have affected the result of the trial. With these preliminary observations we may now proceed to a closer scrutiny of the differing narrations.

The shooting took place on the north side of Pell street, in front of the building known as No. 20, between 9:15 and 9:30 in the evening. For the purposes of this appeal it is not im-

portant to go into a more extended description of the *locus in quo* and its surroundings. First in importance is the testimony of Officer Moroney who was making his beat on the south side of Pell street. He heard two shots on the other side of the street and he saw the flashes from a revolver. He saw a man with his right arm extended in the direction of another man who staggered and fell into the cellar area at No. 18 Pell street, and at that instant the two men were about five feet apart. The man whose right arm had been extended as described wore a gray cap, and he threw something into the street as he started to run immediately after the shooting. Moroney threw away his night stick, drew his pistol and followed. At Pell and Mott streets the retreating Chinaman turned the corner and ran into the arms of Officer Bose who stopped him. According to the testimony of these two officers, the defendant was the man. Moroney says he never lost sight of him from the moment these shots were fired until he turned the corner at Mott street, and it was but an instant after that when he reached Officer Bose. The defendant was taken back to the scene of the shooting, where Yee Toy lay unconscious. An ambulance was called, the stricken man was removed to the hospital, and from there Moroney and Officer Kelly took the defendant to the Elizabeth street police station. There we leave him temporarily while we consider other evidence of the shooting. Catharine Earl Powers, a white woman and a consort of a Chinaman, had been in a restaurant at No. 16 Doyers street, and was walking with Ella Faund in the roadway of Pell street toward Mott street, when they met the deceased who spoke to Mrs. Powers. He had barely passed the women when there was the report and flash of a pistol which, according to Mrs. Powers, was in the hand of the defendant, and the deceased fell into the area already described. The witness Powers was corroborated in every detail by Ella Faund, a

woman of similar associations and character. Another witness was Lillie Hennie. Although married to a man named Hennie she was living with a Chinaman called Foot Jung, at 5 Chrystie street. On this night she had gone to Chinatown to visit Lillie Bates, whom she met and joined on the sidewalk in front of No. 15 Pell street. The two stood there about ten minutes when the defendant walked up to the deceased and pointed a pistol at him. After firing three or four shots the defendant threw away the pistol and ran toward Mott street; and this witness says she picked up the pistol and carried it into a hall-way, where she gave it to the Powers woman. Just here it may be stated, parenthetically, that the subsequent disposition of the pistol was a feature of some interest at the trial, but it is of no importance here. The testimony of Lillian Bates does not differ materially from that given by Mrs. Hennie. The one Chinese witness for the prosecution was Wong Wee, who lived at No. 22 Pell street, and who stood at Pell and Mott streets at the time of the shooting. He said he saw two girls pass. The girls went on and met and passed the deceased, when the defendant drew a pistol, pointed it at the deceased, and fired several shots. The deceased looked around at the defendant and then started to run. The defendant continued to shoot and the deceased staggered to the area of the basement and fell into it. The defendant threw away the pistol, started to run, and the witness followed him for a short distance, but lost his shoe and turned back.

Turning now to the testimony for the defendant, the record discloses an entirely different story. The first of the witnesses, McGowan, testified that he was walking with a friend, Anselmo, on the south side of Pell street. As they neared Doyers street he saw five or six Chinamen on the other side of the street apparently engaged in a wrangle. Suddenly four shots were fired, first one, and then three in rapid succession. A

Chinaman fell into the cellar, and the man who fired the shots ran toward the witness, throwing away the revolver in his flight, and continuing on through Doyers street to Chatham square. This witness was most positive in his assertion that the defendant was not the man who did the shooting, although he did not identify the fleeing man by his face, but rather by his form, which he said was stockier and heavier than that of the defendant. Anselmo, the man who was with McGowan, corroborated the latter as to the shooting, and he also was positive that the defendant was not the man who shot the deceased. The next witness was a Chinaman named Huy Kee, who lived in Mulberry street and knew both the deceased and the defendant. He stated that he was in Chinatown on the evening of June 17, 1912; that he saw the deceased and one Chin Fook together; that he heard the deceased ask Chin Fook for the diamond ring he got from a girl; that these two had words on the subject and that the deceased threatened to put Chin Fook on the ground if he did not give up the ring; that this was quickly followed by one shot fired by the deceased at Chin Fook, which the latter returned by firing three shots at the deceased, who then staggered to the basement; that Chin Fook disappeared in the direction of Doyers street after the shooting and the witness has never seen him since. Ong Sing, another Chinese witness, lived in Allentown, Pa., but was in Chinatown on the night of the homicide. He saw the deceased and Chin Fook together at about 9:20 o'clock in front of No. 18 Pell street. He heard them quarreling over a ring. The deceased threatened to put Chin Fook on the ground, to which Chin Fook replied: "You can do whatever you please." The deceased then suddenly drew a pistol and fired a shot at Chin Fook, which the latter dodged, and then he drew a pistol and fired three shots at the deceased, who then dropped into the basement. Chin Fook then dropped his pistol and ran to Doyers

street.  The witness knew the defendant, but did not see him there that evening.  Too Foo Choo was still another witness for the defense.  He was employed with the defendant in the restaurant of Wong Ding at No. 18 Pell street.  On the night of the homicide these two, Too Foo Choo and Jung Hing, drew their wages, went to Doyers street where they made deposits in a loan association and received receipts from the secretary.  After this they returned in the direction of Pell street.  As they neared the corner of Pell and Mott streets they heard shots and started to run down Mott street, where the police arrested the defendant, while Too Foo Choo escaped and ran to his house.  This witness was very positive that the defendant had nothing to do with any shooting on that night. The defendant was a witness in his own behalf, and the substance of his story is that on June 17, 1912, he was employed in the restaurant of Wong Ding at No. 18 Pell street; that Too Foo Choo was a fellow-employee; that both drew their wages that night and went to the loan association at 17 Doyers street to deposit money, and that they did so; that they then took a cup of tea and a smoke and afterwards started for their place of employment; that as they got to No. 19 Pell street the defendant heard a shot and as he turned his head he heard three more; that he saw other persons running and then he ran over to Mott street where he was stopped by Sergeant Bose; that he did not see the deceased on that evening, that he was on friendly terms with him, and that he had no pistol.

Returning now to the Elizabeth street police station we find the defendant placed in a line with thirteen or fourteen other Chinamen, some dressed in American fashion, and others in Chinese, and all with their hats on.  The women, Powers, Bates, Hennie and Faund, were brought in singly, and each in turn placed her hand on the defendant as a token of her identification of the defendant as the man who shot the de-

deceased. This was proper enough for the preliminary purpose of determining in the police station whether any one of the Chinamen in the line should be held for examination as the probable assailant of the deceased. It was quite another thing, however, to prove *de novo*, on the trial under review, that the witnesses who here testified to the defendant's identity had given similar testimony in the police station. This was, in effect, but a corroboration of these witnesses by their own previous declarations or acts. On this trial the police officers, Maroney and Bose, and each of these women, all identified the defendant as the man who had shot the deceased. The evidence of what occurred in the police station was no different in principle than though the same witnesses had been allowed to state what their testimony on this subject had been on the defendant's first trial, where the jury disagreed. It was nothing more nor less than a bolstering of the present testimony of these witnesses by showing that on a prior occasion they said or did the same thing. Stated thus broadly, this was obviously a self-serving performance of no probative value, and yet strongly calculated to influence a jury of laymen not versed in the rules of evidence. (Reddick v. State, 35 Tex. Cr. Rep. 464.) There are circumstances under which prior statements or acts may be shown in corroboration of witnesses, but these fall into certain recognized classes of exceptions to the general rule, and, as we shall see, have no application here. It is competent, for instance, to show that a witness, who is discredited by the fact that he was an accomplice of the defendant against whom he is testifying, made a prior consistent statement under conditions and at a time when he could have had no motive for falsifying. In such a case the prior statement is not received as so much additional evidence. It is merely the fact that a consistent statement was made that affords the corroboration. (Wigmore on Evidence, § 1132.)

The conditions under which such evidence is admissible were discussed in the recent case of People v. Katz, 209 N. Y. 311, 340; 30 N. Y. Crim. 373), where this court quoted with approval the statement of Judge ALVEY in Maitland v. Citizens Nat. Bank (40 Md. 540) that it " is not admitted to prove or disprove any fact involved in the issue on trial, but simply to corroborate or support the credibility of the witness who may be in some manner impeached."

It must logically follow, of course, that when a witness has not been discredited or impeached there is no reason for resorting to his prior consistent statements. In such circumstances " his testimony under oath is better evidence than his confirmatory declarations not under oath; and the repetition of his assertions does not carry his credibility further, if so far, as his oath." (Mr. Justice STORY in Ellicott v. Pearl, 10 Pet. 412, 439.) Again, a case may be tried on one side on the theory that a witness on the other side is actuated by corrupt motives in testifying as he does; or the evidence may be such as to leave the witness under the imputation that his story is a recent fabrication. In such cases the witness may be corroborated by proof of his prior statements made at a time and under conditions when he could not have been subject to disturbing or corrupting influences. (Wharton on Evidence, vol. 1, § 570.) And so it is conceivable that when the issue is one of identity, and the evidence on that subject is equivocal, as where for instance the person who is the subject of the testimony belongs to a race like the Negro, Indian, Italian or Chinese, whose dress and facial characteristics are so similar as to cause doubt or confusion, it should be permissible to show in rebuttal that a witness, whose direct testimony is uncertain at the trial, made a positive identification so soon after the event and in such conditions as to support or strengthen the later testimony. This seems to be the theory on which Wigmore

lays down the rule that it is entirely proper to corroborate a witness on the subject of identification by showing that " at a former time, when the suggestions of others could not have intervened to create a fancied recognition in the witness' mind, he recognized and declared the present accused to be the person." The learned author illustrates the point by observing that if the person is so placed among others that all probability of suggestion is still further removed the evidence becomes stronger. (Wigmore, section 1130.) This section, standing alone, would seem to favor the resort to such corroboration in any case, but when it is read in its relation to the chapter in which it appears (" Prior Consistent Statements "), and especially when it is considered in the light of the preceding section (1129), to whch it refers, it becomes evident that the author is speaking of corroboration where a witness is sought to be impeached on the ground that his story is one of recent contrivance. That rule, we think, has no application to the case at bar. Here the issue of identification was close, not because the testimony *pro* and *con* was doubtful or uncertain, but because it was so direct and positive as to leave no alternative but to accept it as true or reject it as untrue. In this connection it is important to note that the witnesses on both sides were either Chinese, or white persons familiar with the racial resemblances of the Chinese, and that the People's witnesses, Faund, Hennie, Bates and Wong We, knew the defendant either by actual acquaintance or by sight. In these circumstances we think the evidence of identification at the police station was nothing more than the unsworn confirmation of the testimony of witnesses who had not been impeached except by the usual contradictions inherent in the differing versions of the opposing witnesses. In this view the case of Robb v. Hackley (23 Wend. 50) is a direct authority against the admissibility of the confirmatory evidence, and we find nothing in the Christie Case (10

Cr. App. 141), to support the district attorney's contention that this evidence was competent as part of the direct case for the prosecution.

There is much confusion in the authorities on this subject in other jurisdictions as is shown in our recent discussion in People v. Katz (*supra*), and it arises from the difficulty of keeping the pertinent rules of evidence clearly in view when applying it to constantly differing facts. In the case at bar we have the simple case of unimpeached witnesses who were permitted, on their examinations in chief at the trial, to strengthen their testimony by showing that their previous conduct had been consistent therewith, and this we think was error (Deshon v. Merchants Ins. Co., 52 Mass. 199; Commonwealth v. Campbell, 89 Mass. 541; Murphy v. State, 41 Tex. Cr. Rep. 120) of such serious import that we feel bound to regard it as a sufficient ground for reversal, even though it was allowed to pass at the trial without objection or exception. These prior acts, relied upon as confirmation of the sworn testimony, had in fact no probative effect upon the credibility of the witnesses (Ellicott v. Pearl, 10 Peters, 412, 439), and yet they may have exerted a decided influence on the minds of the laymen who composed the jury. We are not unmindful of the general rule, which obtains even in capital cases, that errors committed by the trial court are not available to the defendant on appeal unless they are presented by proper exceptions. (People v. Tobin, 176 N. Y. 278; 17 N. Y. Crim. 517; People v. Jackson, 196 N. Y. 357, 362.) In the latter case the reason of this rule is very succinctly stated by Chief Judge CULLEN: "The most learned and careful judge will at times during the trial of an action fall into an error which he would at once correct if his attention were called thereto. The purpose of an objection and exception is to call the attention of the judge to the ruling complained of, that he may correct the error if such it is. To-

permit the party to remain silent and suffer the error to go un-
challenged and claim on an appeal from an adverse judgment
the benefit of the error, as if objection and exception had been
taken, would not conduce to the proper administration of jus-
tice nor tend to secure a fair trial for the defendant, but simply
give him an opportunity to reverse on appeal a proper judg-
ment." All this, quoted on the learned district attorney's
brief, is entirely sound and appropriate in cases, like those of
Tobin and Jackson, where it is apparent that a judgment of
conviction, amply supported by the evidence, is not vitally af-
fected by the error committed. In the very next sentence fol-
lowing the quotation, Chief Judge CULLEN makes it clear that
this rule cannot apply to a case in which the error is so serious
that it probably influenced the result, for he continues: " Of
course, if the error was so substantial as to jeopardize the rights
of the defendant and induce a verdict against him that otherwise
would not be rendered, then it would be our duty to reverse
the judgment, although no exception was taken in the trial
court." This utterance plainly accords with the language of
the statute (Code Crim. Pro. section 528), which invests this
court with the power to order a new trial in capital cases when
justice requires it. We think that justice requires a new trial
in the case at bar, because the evidence improperly admitted
bore directly upon the all-important issue of identity. We can-
not say to a certainty that the jury would or should have
rendered a different verdict if this incompetent evidence had not
been received, and that is not what the statute rquires of us.
It is enough that the evidence may have been so harmful as to
support witnesses who without it might not have been believed.
It is to be borne in mind also that this evidence was received not
merely in violation of the defendant's right to a fair trial, but
in contravention of a rule which we cannot ignore without in-
troducing confusion into the body of our law.

It was also error to receive the testimony of the witness Faund to the effect that prior to the trial she had told Assistant District Attorney Minton the same story that she narrated in court.  Such evidence is admissible, as we have seen, when it is resorted to for the purpose of corroborating a witness who has been impeached or discredited by evidence showing that his testimony in court is or may be a recent contrivance; but only when the corroborating statement was made at a time so near the event and under such conditions as to indicate that there was then no opportunity for outside suggestion and no apparent motive for falsifying.  Assuming that the witness Faund had been so far impeached on cross-examination as to render it proper to resort to her prior consistent statements, it was still necessary to show that they were made under circumstances which precluded the probability of their being inspired by others.  This was not done, and the failure to observe this precaution rendered the evidence incompetent.

There is still another error that must be mentioned although it is perhaps not so serious as the two above discussed.  According to the witnesses for the prosecution, the defendant opened fire on the deceased without any previous altercation or quarrel.  On the other hand there was testimony for the defense tending to show that the deceased was shot by Chin Fook in a quarrel over a diamond ring which the deceased stated he had given his girl, and which he accused Chin Fook of having in his possession.  There was also some evidence indicating that Gertrude Williams was the girl in question.  The prosecution, in rebuttal, called this girl as a witness, and she was permitted to testify that she did not know Chin Fook; that she never gave him a diamond ring; that she never had a diamond ring to give him, and that the deceased had never given her any jewelry.  It is clear that the conversation at the shooting, between the deceased and Chin Fook, was properly received, not as evidence

of the truth of what was declared, but because the speaking of the words was one of the facts in issue. The fact in issue was whether the statement had been made by the deceased, and not whether it was true. It was, therefore, improper to admit the testimony of Gertrude Williams to deny the truthfulness of the statements attributed to the deceased concerning the ring. (Wigmore, section 1768; Cherry v. Slade, 2 Hawks [N. C.], 400; Smith v. Whittier, 95 Cal.. 279; Collins v. Stephenson, 74 Mass. [8 Gray] 438; People v. Harris, 209 N. Y. 70.)

We shall not discuss the defendant's contention that the trial court coerced the jury into an agreement upon a verdict; neither do we decide whether there is any ground for it. · The circumstances upon which it is predicated will, in all human probability, not be reproduced on another trial. With respect to the alleged error in the charge on the subject of reasonable doubt, our conclusion is that the charge in its entirety fairly presented the question to the Jury. We desire once more to emphasize the observation that we have not attempted to discuss all the testimony bearing on the general issue of fact, and that we have purposely limited our review to the particular questions which in our judgment require the reversal of this judgment of conviction.

WILLARD BARTLETT, Ch. J., CHASE, COLLIN, HOGAN and CARDOZO, JJ., concur; CUDDEBACK, J., not voting.

Judgment of conviction reversed and new trial ordered.