## SUPREME COURT — APPELLATE DIVISION — FOURTH DEPARTMENT.

### May 1, 1918.

### THE PEOPLE v. DAVIS.

(171 N. Y. Supp. 157.)

LARCENY—SUFFICIENCY OF EVIDENCE.

Evidence *held* sufficient to establish commission of larceny and identify defendant as the perpetrator.

CRIMINAL LAW—EVIDENCE IN VIEW OF CROSS-EXAMINATION.

Defendant, having by cross-examination of witness, who identified defendant as the thief, attempted to show that when he was apprehended witness said the thief had a mustache and was differently dressed, cannot complain of evidence that witness then identified him.

APPEAL from Onondaga County Court.

Hyman Davis was convicted of grand larceny in the first degree as a second offense, after a conviction of the crime of burglary in the third degree; and from the judgment, and from an order denying a motion for new trial on the ground of newly-discovered evidence, he appeals.    Affirmed.

Argued before KRUSE, P. J., and FOOTE, LAMBERT, MERRELL, and DE ANGELIS, JJ.

*Daniel T. Scully* and *Oliver D. Burden,* both of Syracuse, for appellant.

*John H. Walrath, District Attorney,* of Syracuse, for the People.

DE ANGELIS, J.:

On Tuesday evening, December 12, 1916, at about forty-five minutes after eight o'clock, on East Genesee street, one of the

thoroughfares of the city of Syracuse, the crime of grand larceny in the first degree was committed, in that a certain man broke the large glass window of the pawnbroker's shop of one Moe Amdur and took from a rack from which they were suspended in the shop diamond rings belonging to him of the value of more than $500, and in fact of the value of nearly $2,000, before the shop was closed for the night, and while Amdur and his wife were in charge thereof. Amdur went out of the door of his shop in pursuit of the thief, who took a revolver from his hip pocket and fired it at Amdur. Amdur retreated. The thief again reached through the window and took more diamonds. Amdur returned to the attack, the thief fled and fired another shot at Amdur, and then the chase after the thief began, which will be described hereafter.

The defendant has been convicted of the crime, and the judgment of conviction and an order denying his motion for a new trial upon alleged newly-discovered evidence are here under review. The claim of the defendant is that he did not commit the crime, that in any event the proof failed to identify him as the thief, and that he has established an alibi. The defendant also complains of errors in the reception of evidence by the trial court and that his motion for a new trial was erroneously denied.

The boldness, the dash, the picturesqueness, of the crime, the claim of the defendant that his former criminal career had led to his conviction upon evidence insufficient to connect him with the offense, the claim of the defendant that the evidence of the witnesses who identified him by direct proof as the thief was born of the alleged suggestion of the police of the city that he alone could have committed the crime, have led us to examine and consider the evidence with great care, and, as the result of that examination and consideration, we are satisfied that the proof fully justifies the conviction.

There is a reference in the defendant's brief to the possibility that the offense was what is termed in criminal parlance a "frame-up" on the part of the owner of the pawnshop to obtain

the benefit of his burglary insurance; but when it is considered that the most he could have gotten under his policy of insurance was $200 and that to replace the large glass window that was broken would have taken much of that amount, when it is considered that all of the evidence, and especially that produced by the defendant, is not only in direct conflict with the "frame-up." idea, but established, beyond controversy, the commission of the offense, the possibility suggested sinks into insignificance.

The theater of the transaction is confined to the limits of a circle whose center is at about the point of intersection of the center line of East Washington street and the center line of Grape street, and whose radius is less than 1,000 feet. Out of this circle southerly, not to exceed 500 feet, are the saloon and pawnbroker's shop of Harry Cohn, the witness for the defendant who accompanied him to the police station on the night of the commission of the crime, the home of Lillian Davis, the sister of the defendant, who testified to the alibi, and the millinery shop of Mrs. La Vine, another sister of the defendant, where Lillian worked.

The pawnshop of Amdur is situated in the northwest angle of the triangle bounded northerly and easterly by East Genesee street, southerly by East Fayette street, and westerly by Montgomery street. That block is bounded northerly by East Washington street, easterly by South State street, southerly by East Fayette street, and westerly by Montgomery street. East Genesee street, running in this locality northwesterly and southeasterly, passes through the block diagonally, leaving the triangle, in whose northwest angle Amdur's pawnship is located, on the southwest, and the other triangle on the northeast. The Yates Hotel, on the west side of Montgomery street, is just across the street from the Amdur pawnshop. On the same easterly side of Montgomery street on which the pawnshop is situated, but further north, the City Hall is located. The City Hall is bounded northerly by East Water street, easterly by a narrow

street known as Market street, southerly by East Washington street, and westerly by Montgomery street.

Montgomery street runs southerly from East Water street. The streets running northerly and southerly and parallel to each other, east of Montgomery street, are, in this order, South State street, Grape street, Orange street, and Almond street. These streets all start at the Erie Canal, except State street, which continues northerly of the canal as North State street. Grape street is continued north of the canal as Townsend street, Orange street as McBride street, and Almond street as Catherine street.

The Erie Canal runs easterly and westerly through the city, with its towpath at its northerly side. The streets running easterly and westerly in the locality of this transaction are Canal street next north of the canal, East Water street next south of the canal, and then, in this order to the south, East Washington street, through which runs the New York Central Railroad, East Fayette street, East Jefferson street, Cedar street, Madison street, and Harrison street.

The doorway and entrance to the Amdur pawnshop is at the northwest angle of East Genesee street and Montgomery street. It was the large glass window on the East Genesee street side of the pawnshop which the thief shattered with a slung-shot containing a brick. Amdur testified that the noise made at the time was like an explosion and that he saw in the shattered window what appeared to him like smoke. Two passenger trains, one going east and one going west, were passing on East Washington street when the window was shattered. Amdur rushed out the front door and saw the defendant reaching through the window and taking the diamonds from the diamond rack and putting them into his pocket. Amdur shouted at him, and he took one step back, drew a revolver from his hip pocket, and fired at Amdur. Amdur ran to the curb of the sidewalk, and the defendant meantime reached in through the window and

took more diamonds. The defendant then turned and fled, going northerly on Montgomery street towards East Water street. Amdur pursued him, and when the defendant got about two-thirds of the way to East Water street he turned and fired another shot at Amdur and then continued his flight.

We have now to consider the pursuit of the thief, referred to in the evidence as the " chase." The evidence does not disclose fully all those who participated in the pursuit. A person said to be an officer and a person referred to as " Kid·Black " appeared to have been among the pursuers, but they were not sworn. One witness described Kid Black as starting on the quest with a revolver in his hand. The only witnesses called who testified to their participation in the pursuit were Amdur, who testified in behalf of the people, and Lavner and Cassidy, who testified in behalf of the defendant.

Amdur testified that he followed the thief along Montgomery street to East Water street, thence easterly on East Water street to South State street, thence northerly on South State street, across the bridge, to Canal street, and thence easterly along Canal street until he lost sight and trace of him at a lumber yard on Canal street.

Lavner testified that he came from the saloon of Wolf & Comiez, the place of business on East Genesee street next east of Amdur's pawnshop, went northerly on Montgomery street to East Water street, thence easterly on East Water street to South State street, thence northerly on State street, across the bridge, to Canal street, thence easterly along Canal street and the tow-path to Almond street, and thence southerly on Almond street, over the bridge, and to the corner of Almond street and East Washington street, where he stopped. He claimed to have seen a man running on Almond street, and that he disappeared at the corner of Almond street and East Washington. He testified that the man ran fairly fast. His testimony showed some confusion, but I think it is fairly to be inferred that when he lost

sight of the fleeing man, who at the time was at the corner of Almond street and East Washington street, he (the witness) was at the Orange street bridge, and that then he went on by the towpath, where he saw tracks in the snow to Almond street, passed over the Almond street bridge, and gave up the chase at the corner of Almond street and East Washington street.

Cassidy testified that he was one of the pursuers, and went northerly on Montgomery street to East Water street, thence easterly on East Water street to South State street, thence northerly on State street, across the bridge, to Canal street, thence easterly along Canal street to McBride street, and thence southerly to the Orange street bridge, and that from the top of the bridge he saw a man running on the towpath, and saw him disappear at the corner of Almond street and East Washington street; that he (Cassidy) went on to the corner of Almond street and East Washington street; that he then went back north on Almond street to Orange alley, a narrow alley, about half way between East Washington street and East Water street, went west through the alley to Orange street, finding fresh tracks in the snow in the alley; that he then went over Orange street northerly to East Water street, and thence upon the Orange street bridge, and that when he got on top of the bridge, but not before, he saw the defendant ahead of him on the bridge, also going north. This witness was not interrogated further by the counsel for either party as to additional acts in connection with his part in the chase.

It is undisputed that at about 15 minutes after 9 o'clock that night (and in this connection it is to be remembered that the jury were justified in finding that the crime was committed at a quarter of 9) this defendant walked into the saloon of Harris Levine at the northeast corner of Canal street and McBride street, within less than 200 feet of the place where the witness Cassidy testified that he had left him. Levine testified that the defendant ordered a short beer, and that while he was there

Cassidy opened the door and shouted, " Hymie, you had better beat it out, or they will be blaming it on to you." It appeared that the defendant went into another room in the saloon back of the bar, where he talked with one Nicholas Emm, and then left the saloon by the side door. It is uncontradicted that the defendant asked Emm to trade hats with him, as he had just hit a guy outside and wanted to disguise himself. Emm testified that the defendant acted excited, and Levine did not deny that he made a statement at the police station that the defendant appeared to be breathing quite heavily.

A man can walk three miles an hour easily. The distance covered by the defendant in his flight down to the time when he entered Levine's saloon was considerably less than a mile, and he had abundant time to cover the ground on a walk. The evidence does not disclose that either pursuers or pursued risked their lives because of any great exertion in the chase. The inference to be drawn from the testimony of a physician 25 years of age, who had practiced his profession two years, and was called as a witness by the defendant, that the defendant was not able to cover the distance of his flight as proven, did not convince, and ought not to have convinced, the jury of its reliability.

About half after 11 o'clock on the night of the larceny the defendant, accompanied by Harry Cohn, the saloon keeper and pawnbroker, the defendant's brother Abram, and Detective Connelly of the Syracuse police force, appeared in the police court, where the defendant was held and was identified first by Moe Amdur and later by Mrs. Amdur. Cohn assumed to produce and did produce the defendant at the request of the police.

Moe Amdur, the proprietor of the pawnshop where the larceny occurred, and his wife, who ought to know better than anybody else, positively identified the defendant as the thief. Their testimony, together with the fact of the presence of the defendant on the Orange street bridge and in the Levine saloon, and

what occurred there, leave no doubt that the defendant committed the larceny. The attempt to show by the defendant's sister Lillian that he was at her house on Madison street at the time the crime was committed, and the testimony of the other witnesses called by the defendant, tending to show that the person who committed the crime was taller than the defendant, and of a build and complexion different from those of the defendant, and wore a different hat from that described by the witnesses for the people, at most presented a question of fact for the jury, and the verdict embodied the only rational conclusion that the jury could have reached upon the evidence.

The defendant sought to show that Detective Carroll, of the police force, stated at the Amdur pawnshop that night, after the burglary: "There is only one man. We might as well go and look up Hyman Davis." Carroll denied that he made the statement. It must be remembered in this connection that Cassidy returned to the Amdur pawnshop after the chase that night, and that he talked quite freely, and that it would be strange, indeed, if the defendant's name was not mentioned there by Cassidy and others. If Cassidy disclosed the fact of his overtaking, at the psychological moment, the defendant on the Orange street bridge, a detective would have been utterly stupid if he did not immediately associate the defendant with the crime. It is to be noted that the defendant's counsel introduced into the case the notion of the defendant's guilt, because he was thought to be the only person in Syracuse who would be likely to commit the crime. The charge against the defendant certainly had a more substantial basis.

The motion for a new trial upon newly discovered evidence was properly denied under all the authorities, as well as under subdivision 7 of section 465 of the Code of Criminal Procedure, relied upon by defendant's counsel.

The evidence of what occurred on the defendant's way to the police station on the night of the larceny, and after the defend-

ant had been apprehended and was in custody, bearing upon his identification as the thief, whether objected to by the defendant or not, under the authority of People v. Jung Hing (212 N. Y. 393, 106 N. E. 105, Ann. Cas. 1915D, 333) and People v. Seppi (221 N. Y. 62, 116 N. E. 793), would seem, at first blush, to have been prejudicial to the defendant, and hence improperly received; but we think that such evidence was competent in the circumstances surrounding its reception. It will be recalled that the defendant was accompanied to the police station by his friend, Harry Cohn, his brother Abram, and Detective Connelly, and that these men and Frost, the acting captain of the police force, were present in the police station when the defendant arrived there and his identification by Moe Amdur took place. Later that night the defendant was taken from his cell in the basement of the police station into the corridor, and was there identified by Mrs. Amdur, and what occurred there was in the presence only of Mrs. Amdur, the defendant, and Detective Connelly, as they supposed; but the defendant's witness Sweeney was willing to testify that he had gone into a balcony on that occasion and was a witness to what occurred.

Moe Amdur was the first witness called by the people, and no reference was made by him, upon his direct examination, to anything that occurred at the police station on the night of the larceny, or on the defendant's way to the police station that night; but on cross-examination the defendant sought to show that on the way to the police station, in the presence of the defendant and the other persons mentioned, the witness stated that he did not see the man who broke into his pawnshop, and that, at the police station, in the presence of the persons mentioned, he said that the man had a black mustache. So that the defendant first raised the question as to what occurred on those occasions and opened the door to the subject. This conduct on the part of the defendant's counsel indicated to the

people that the defendant proposed to challenge and contradict what was claimed by the people to have occurred on those occasions. Thereupon, it may be assumed out of order, but in anticipation of the evidence of the defendant, the prosecution showed by Mrs. Amdur the fact that she went to the police station about half after 11 o'clock on the night of the larceny, and that in the corridor downstairs, where the defendant had been brought from his cell, she identified him as the man who had committed the crime. The cross-examination of this witness further indicated the claim of the defendant that she could only have seen the back of the head and the back of the body of the defendant at the time of the commission of the crime, and that for that reason such portion of his head and such portion of his body were presented to her at first in the corridor at the police station to test her ability to identify him therefrom, and such cross-examination further disclosed the claim of the defendant that she did not recognize the defendant from her first or alleged second view of him at the police station, and the claim of the defendant that she whispered to the officer, " It is not the man with the same clothes that I saw running and firing the gun." By such cross-examination the defendant sought further to show that the witness paused four or five minutes after looking at the defendant before she recognized him as the thief.

The prosecution also thereafter showed by Frost, the acting captain of the police force, and by Detective Connelly, what occurred upon the subject foreshadowed and fairly opened for consideration by the defendant, involving the identification of the defendant on the occasions mentioned, and the cross-examination of these two witnesses further developed the claims made by the defendant already referred to. The defendant sought to establish these claims by the testimony of Harry Cohn, Joseph P. Sweeney, and Abram Davis.

The evidence complained of could hardly be said to be hear-

say, because everything testified to took place in the presence of the defendant. If the evidence had been introduced upon the theory that, from the failure of the defendant to speak on the occasions referred to, he was deemed to admit what was said, it would clearly have been incompetent, because there was nothing about the situation that called upon him to speak. If at all, the evidence should have been excluded as self-serving; the idea being that, while the witnesses could testify upon the trial to the identity of the defendant as the thief, they would have no right to fortify such identifications by testifying that they had identified the defendant as the thief on some former occasion.

But, as I have already indicated, the defendant opened the door to the reception of the evidence complained of, and he has not been prejudiced thereby. Although it is too late for a different view of the law upon this subject to be expressed in this State, proof of former identifications of persons on trial charged with the commission of crimes has been approved as part of the people's case for its intrinsic value alone by as high authority as Judge COOLEY. (People v. Mead, 50 Mich. 228, 15 N. W. 95.)

It follows, from the foregoing, that the judgment and order appealed from should be affirmed. All concur.