THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* HARRY VAN ARSDALE, JR., Appellant.*

Second Department, June 8, 1942.

*Louis Waldman* [*Solomon Jacobson* and *Harold Stern* with him on the brief], for the appellant.

*Edmund C. Rowan* [*Charles P. Sullivan, District Attorney*, with him on the brief], for the respondent.

PER CURIAM. (1) To sustain this conviction, as was said by CARDOZO, J., " Enough must be shown to justify the inference that

* See *People* v. *Mangano* (264 App. Div. 870).

the offender has counseled or induced or encouraged the crime * * *." (*People* v. *Swersky*, 216 N. Y. 471, 476.)

The proof is overwhelming that riots of a most violent character were in progress between August 1, 1940, and September 24, 1940, particularly on September 24, 1940, at and adjacent to the plant involved in the strike. The proof which the jury was free to credit amply sustained the finding or inference that the defendant " counseled or induced or encouraged the crime." His utterances prior to the beginning of the strike evinced a purpose personally to engage in unlawful acts or to encourage others to do so. Only such conduct would result in a situation where defendant would " sit in jail and rot " to win the strike. A peacefully or lawfully conducted strike would not expose the defendant to any such hazard. The riot that ensued shortly after the defendant talked to the strikers about six A. M. on September 24, 1940, included riotous and lawless acts of violence which need not be detailed. The evidence warranted the jury in finding that the defendant was present just before and at the time of this rioting, that he encouraged it, and by his conduct approved it except in the instance when he brought about a partial cessation of it in connection with the violence exerted on a private person and an automobile in which the latter was riding. The evidence established that he was in absolute control of the conduct of the strike and of the actions indulged in to forward it. Evidence of other facts and circumstances reinforced the conclusion that the defendant " induced or encouraged the crime " of riot in progress on September 24, 1940.

In arriving at its conclusion, the jury was free to draw from items of direct proof natural, independent, paralleling inferences of fact — which were not superimposed. It must be presumed that the jury did this, and it may not be presumed on a basis of artificial, synthetic speculation that the jury indulged in a supposititious course of drawing inferences from inferences when recourse thereto was not indispensable to arriving at its conclusions.

The jury was free to find the defendant guilty on the proof herein whether he was present or absent during the rioting. (Penal Law, § 2, " Principal.")

(2) Exhibit 23 was properly received in evidence. Defendant's counsel did not pursue the practice, with respect to such a paper in the hands of the district attorney, outlined in *People* v. *Walsh* (262 N. Y. 140, 149). In connection with this paper he flatly charged that the witness under examination was " coached." After thus impugning the integrity of the witness, and with the paper in his hand, he asked repeatedly whether the witness had been inter-

rogated in question and answer form, although the paper disclosed that the witness had signed an affidavit in narrative form. If the paper contained leading questions and answers wherein the questioner's desired version was projected into the mind of the witness, the form of the paper would sustain the charge that the witness was " coached." If the paper contained a series of questions and answers which revealed a moulding of the views of the witness to the views or version desired by the questioner, such a course of the questioning would sustain the view that the witness was " coached." The form of the paper, however, disclosed that neither of these conditions existed, and, therefore, repelled the charge that the witness was " coached." Certain questions insinuated that what happened while the witness was being questioned by the district attorney was not reflected in the paper; others charged or insinuated that the witness had been influenced or corrupted by named individuals. All these things constituted further attacks upon the integrity of the witness in relation to the paper. This conduct of defendant's counsel made the exhibit admissible in evidence because the charges and the manner of interrogation of the witness made applicable the exception to the general rule in respect of a prior consistent statement which permits its receipt in evidence " when the witness rests under the imputation of a recently formed motive to falsify," as well as on the theory that " it tends to support the integrity of the witness, no less than the accuracy of his recollection; " or where the witness rests, as in the case at bar, under the charge that he has been suborned or " has recently fabricated his testimony to meet the exigencies of the case." (*People* v. *Katz*, 209 N. Y. 311, 339, 340.)

In any event, in view of the volume of proof in the case and the short lapse of time between the signing of the paper and the giving of testimony, the admission of the paper under the circumstances, even if it were not strictly proper, involved no prejudicial error.

The judgment of conviction should be affirmed.

The appeals from the order overruling demurrer, from the order denying the defendant's motion for a bill of particulars, and from the order denying defendant's motion to set aside the judgment of conviction and for a new trial on the ground of newly-discovered evidence should be dismissed as not appealable.

CARSWELL, ADEL and TAYLOR, JJ., concur; LAZANSKY, P. J., and CLOSE, J., concur for dismissal of the appeals from orders, but dissent from affirmance of the judgment of conviction and vote to reverse the judgment and to order a new trial, with separate opinions.

Lazansky, P. J. (dissenting). The indictment charged fifty-four persons — sixteen as defendants — with conspiracy to commit thirty-nine different crimes. It also charged the sixteen defendants with coercion in three counts, each based upon separate acts; with malicious injury to property in three counts, each based upon separate acts; with assault in the second degree in four counts, each upon a different person; with resisting a public officer in the discharge of his duty; with violation of section 2092 of the Penal Law (unlawful assembly); with violation of section 2094 of the Penal Law (remaining present at a place of meeting, originally lawful, after it had adopted an unlawful purpose); with the crime of riot; and with the crime of attempt to commit riot. At the close of the People's case, the fourth count (coercion of a public officer) was dismissed as to all defendants on their motion. The sixteenth count, charging the crime of riot, was dismissed as to all defendants on the district attorney's motion. At the close of the entire case, the fourteenth count (refusing to leave a lawful assembly after it became unlawful) was withdrawn by the district attorney. The entire indictment was dismissed as to one of the defendants and went to trial as to fifteen of them. Out of this mass of crimes and persons, after a trial lasting thirty-two days, eleven defendants were acquitted on all counts and only four were convicted. Two found guilty of assault were sentenced, but have not appealed. The defendant Van Arsdale alone was convicted of riot under the fifteenth count.

The charge of riot in the fifteenth count was that defendant, with about 2,000 others, assembled on September 24, 1940, at a place in Queens county and willfully, unlawfully and feloniously disturbed the public peace by using force and violence to other persons and property, by cutting a police officer with some sharp instrument; by striking police officers about the head and body; by throwing stones, creating great noise, and by stopping automobiles on the public highway and overturning them.

It is not claimed that the defendant actually participated in the overt acts, but that he encouraged and counseled them. He was the business manager of Local 3 of the International Brotherhood of Electrical Workers, which was on strike in relation to the employees of the Triangle Conduit and Cable Company, Inc.

In my opinion, if it had not been for the testimony of one Eckhardt, it is very doubtful that defendant would have been convicted. Eckhardt was a member of the union, employed by the Triangle Company, but did not join the strikers. He testified that at a meeting of the union on Saturday, July 27, 1940 — four days before the strike began — he heard defendant in a speech

say, " We will win this strike if I have to sit in jail and rot." The only other testimony which involves defendant is: (1) Prior to the beginning of the riot on September 24, 1940, he delivered a speech at a shack 185 yards away from the place of the disturbances. What he said was not disclosed. (2) In the shack there were some printed cards entitled " The Scab." It was stated on the card: " Democracies of workingmen have to fight him out of sheer self-protection, * * *. The clubbing of scabs is not a pretty thing; * * *." Then appears what purports to be a statement of a distinguished ex-president of a leading university that " there is no such thing as peaceful picketing." There is no proof whatsoever that appellant Van Arsdale knew anything about these cards. (3) A witness named Weber, who was a stranger to the strike, was driving along Cooper avenue, where the strikers were. His experiences and testimony, which involve Van Arsdale, are aptly presented in the opinion of Mr. Justice CLOSE.

It appears that the proof against defendant, exclusive of the testimony of Eckhardt, rests in doubtful inference. That being so, the testimony of Eckhardt was of serious import. The alleged vivid expression of a resolution by defendant to win the strike at the expense of his liberty and his body gave vitality and force to the rest of the proof and must have been an important factor with the jury in concluding that he had counseled the strikers to riot. The defendant and others denied that he was present at the meeting of the union on July 27, 1940. If, therefore, there was error in the admission of any proof confirmatory of Eckhardt's testimony, it was serious.

On the cross-examination of Eckhardt it appeared that, on one of the days on which the trial was being held, he was subpœnaed to attend in court and testified. The subpœna had been delivered to him by one Alderman, who was in the employ of the Triangle Company. Before going to court, Eckhardt went to the district attorney's office, where he met two of the assistants. There was a stenographer present. Eckhardt made an affidavit containing the facts as to which he testified. After cross-examination of Eckhardt (hereinafter considered), the district attorney offered the affidavit in evidence on the ground, in effect, that it and the testimony were consistent. By this he meant that the affidavit confirmed the testimony and thus was a prop to Eckhardt's credibility. The affidavit (Exhibit 23) was erroneously received in evidence.

The general rule is that testimony of a contradicted, impeached or discredited witness cannot be confirmed by proving that he has made similar declarations out of Court (*Robb* v. *Hackley*, 23

Wend. 50, 53, cited in *People* v. *Katz*, 209 N. Y. 311, 337, 338.) There is, however, an exception to this rule: Where a witness " has been impeached by evidence showing that he has testified under corrupt motives or has recently fabricated his testimony to meet the exigencies of the case," " it may be shown that he made similar statements at a time when the imputed motive did not. exist." (*People* v. *Katz, supra*, pp. 339, 340.) The exception to the rule may also be applied where the corrupt motive is imputed under cross-examination. (*Griffin* v. *City of Boston*, 188 Mass. 475; 74 N. E. 687; *Robb* v. *Hackley, supra*.)

On cross-examination Eckhardt had volunteered the information that he had gone to the district attorney's office before he went to court. Counsel for defendant, not knowing that a statement or affidavit had been made, asked if there were questions and answers taken down in the district attorney's office. Eckhardt answered in the affirmative. Thereupon counsel for defendant asked for the production of the paper. The district attorney, without warrant, offered it in evidence three times. Then the court asked counsel if he wished to offer the statement in evidence. Counsel objected to " offering in evidence a statement which I know nothing about, which was not yet taken until after this witness was coached." When the district attorney realized that counsel wished to use the affidavit for cross-examination, it was produced. Thereupon, in view of Eckhardt's earlier testimony that he had been asked and answered questions in the office of the district attorney, counsel sought to show, if possible, that more had been said than was contained in the affidavit. He asked the witness three times if he was asked questions and once if he had made answers and also asked him if he had said anything else to the district attorney. The witness insisted that all that had taken place was the making of the statement.

This cross-examination was proper. It did not bring the situation within the exception to the general rule. There was merely an effort to contradict the witness in order to show a different version of the meeting with the district attorney. In this connection, the admission of the affidavit (Exhibit 23) was a violation of the general rule. (*People* v. *Katz, supra*, at pp. 337, 338.) However, the charge made by counsel for Van Arsdale that Eckhardt had been " coached " *before* he made the statement to the district attorney imputed a corrupt motive on the part of the witness and presented a situation where, if the affidavit had been made when there was no motive to falsify, it would have been admissible for the purpose of sustaining the credibility of the witness. But the charge made by counsel was that the coaching was done *before* the statement

was made. If Eckhardt's motive was corrupt, as the charge imputes, at the time of the testimony, then it was likewise corrupt at the time the statement was made. It was the same evil motive on each occasion. (*People* v. *Collier*, 141 App. Div. 111.) If the testimony was a recent fabrication, so was the affidavit. What was said in *People* v. *Jung Hing* (212 N. Y. 393, at p. 405) is pertinent: " It was also error to receive the testimony of the witness Faund to the effect that prior to the trial she had told Assistant District Attorney Minton the same story that she narrated in court. Such evidence is admissible, as we have seen, when it is resorted to for the purpose of corroborating a witness who has been impeached or discredited by evidence showing that his testimony in court is or may be a recent contrivance; but only when the corroborating statement was made at a time so near the event and under such conditions as to indicate that there was then no opportunity for outside suggestion and no apparent motive for falsifying. Assuming that the witness Faund had been so far impeached on cross-examination as to render it proper to resort to her prior consistent statements, it was still necessary to show that they were made under circumstances which precluded the probability of their being inspired by others. This was not done, and the failure to observe this precaution rendered the evidence incompetent."

The conditions essential to the application of the rule, which is an exception to the general rule, were not present.

For the foregoing reasons, the affidavit was improperly admitted in evidence. Its admission was harmful. The judgment should be reversed and a new trial ordered.

The appeals from the orders should be dismissed.

Close, J. (dissenting). I concur as to the dismissal of the appeals from the orders but dissent from affirmance of the judgment of conviction and vote to reverse the judgment and to order a new trial upon the ground that the guilt of the defendant was not established beyond a reasonable doubt.

The People established beyond peradventure of a doubt that a riot almost reaching the proportions of civil war occurred at the time and place alleged in the fifteenth and sixteenth counts of the indictment. There was testimony that would permit the jury to draw the inference that Van Arsdale was guilty on other counts in the indictment, but I cannot find sufficient evidence in this voluminous record to support the verdict of the jury that he was guilty beyond a reasonable doubt of the crime of riot. The only witness that identified the defendant as being actually present at the scene of the rioting was the witness Weber. A

careful reading of his testimony fails to establish any riotous act on the part of the appellant. At the worst, the admission claimed to have been made by the appellant from which the jury might infer that he promised to have the union reimburse the witness for the damage his car had suffered was after the event, and if we assume that this promise voiced approval of what had been done, such approval after the fact would not be sufficient. (*People v. Swersky*, 216 N. Y. 471, 476.) That is the only evidence that places this appellant at the scene of the riot. Weber testified that after his conversation with Van Arsdale, he (Van Arsdale) walked away in the company of another defendant, one Mangano, after Mangano had used language indicating that the rioting was to continue. The jury acquitted Mangano and all the other defendants except Van Arsdale on the fifteenth and sixteenth counts. There is no evidence of any rioting after Van Arsdale spoke to Weber; nor is there any evidence of rioting at the time the policeman summoned Van Arsdale, as testified to by Weber. Weber, by his own testimony, was then solely interested in getting compensation for the damages to his automobile. It is apparent from his testimony that some time had elapsed between the time his car was turned over and the time when Van Arsdale was summoned by the police officer from the place where he was standing across the street. That the street was then clear is apparent from Weber's testimony that Van Arsdale and he met in the middle of the street. The entire testimony of Weber, when carefully examined, is as indicative of Van Arsdale's innocence as it is of his guilt.

Judgment of the County Court of Queens County convicting defendant of the crime of riot affirmed.

Appeals from orders dismissed, as not appealable.